**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF WISCONSIN — MILWAUKEE DIVISION**

| | | |
|---|---|---|
| _____ | ) | |
| DOES 1, 7, 8, and 9, individually; | ) | |
| DOES 2, 4, 5, and 6, individually | ) | |
| and as taxpayers; | ) | |
| DOE 3, a minor, | ) | |
| by DOE 3's next best friend, DOE 2; | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:09-cv-409 |
| | ) | |
| ELMBROOK JOINT COMMON SCHOOL | ) | |
| DISTRICT NO. 21, | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR LEAVE TO PROCEED USING PSEUDONYMS**

## CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      Disclosing Plaintiffs' Identities Would Place Them at Risk of Ostracism,
        Harassment, Discrimination, Economic Injury, Governmental Retaliation,
        and Even Physical Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Establishment Clause Plaintiffs Routinely Face Harassment and Other Forms of
                Retaliation, Including Physical Violence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      Plaintiffs Each Fear Particular Forms of Retaliation Should Their Identities Be
                Disclosed — For Most, Based on Past Experience . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.     Plaintiffs' Use of Pseudonyms Is Necessary to Protect the Privacy of Children and Other
        Particularly Vulnerable Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.    Plaintiffs' Interests In Maintaining Their Anonymity Far Outweigh Any Potential for
        Prejudice to Defendant and the Public's Interest in Disclosure . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# INTRODUCTION

This lawsuit challenges the practice of the Elmbrook School District ("the District") of holding its annual graduation ceremonies in the sanctuary of a Christian house of worship — Elmbrook Church ("the Church") — beneath an immense, uncovered, Christian cross.  Plaintiffs contend this practice violates the Establishment Clause of the U.S. Constitution's First Amendment, and they seek, among other types of relief, an injunction requiring the District to move its graduation ceremonies to a secular venue.  In the present motion, they request an order permitting them to proceed through pseudonyms, with their identities disclosed only to the Court.

Suits challenging governmental conduct under the Establishment Clause tend to arouse strong emotions in the affected community, and thus far, this case has proven no exception.  Establishment Clause plaintiffs and their families often suffer social ostracism, economic injury, governmental retaliation, and even physical violence.  Plaintiffs here fear that they, too, will suffer harassment and retaliation — fears to which their own past and recent experiences in the Brookfield community have contributed.  Plaintiffs' interests in their own and their families' safety, well-being, and privacy far outweigh the public's interest in knowing their identities and any potential for prejudice to the District.  Accordingly, the Court should grant Plaintiffs leave to proceed using pseudonyms.

# ARGUMENT

The Seventh Circuit has held that although anonymous suits should be permitted only in unusual circumstances (*see, e.g.*, *Coe v. County of Cook*, 162 F.3d 491, 498 (7th Cir. 1998); *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir. 1997)), "a justified interest in privacy warrants concealment of a litigant's name."  *Coe*, 162 F.3d at 498.  "The presumption

1

that parties' identities are public information, and the possible prejudice to the opposing party from concealment, can be rebutted by showing that the harm to the plaintiff . . . exceeds the likely harm from concealment." *Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004). The balance of these competing interests can favor anonymity when either of two factors is present: (a) due to the nature of the plaintiff's claim, disclosure of his or her identity would place the plaintiff at risk of retaliation by others (*see id.*); or (b) the plaintiff possesses certain characteristics — such as youth or membership in a vulnerable group — that heighten concern for his or her privacy (*see Blue Cross*, 112 F.3d at 872).

Here, both factors are present. First, disclosing Plaintiffs' identities would place them at risk of ostracism, harassment, discrimination, economic injury, governmental retaliation, and even physical harm. An alarming history of violence and threats of violence against Establishment Clause plaintiffs demonstrates the enormity of the potential consequences for these Plaintiffs. And more particularly, each Plaintiff fears specific forms of retaliation should his or her identity be disclosed — for most, based on past experiences. Second, because the plaintiffs in this case are all religious minorities, one is a minor, and three are parents of minor children, their use of pseudonyms is necessary to protect the privacy of particularly vulnerable parties.

## I. Disclosing Plaintiffs' Identities Would Place Them at Risk of Ostracism, Harassment, Discrimination, Economic Injury, Governmental Retaliation, and Even Physical Harm

The Seventh Circuit has held that anonymous litigation may be justified when the plaintiff would be "a likely target of retaliation by people who would learn her identity only from a judicial opinion or other court filing." *City of Chicago*, 360 F.3d at 669. Indeed, "[t]he danger

2

of retaliation is often a compelling ground for allowing a party to litigate anonymously." *Id.* (noting that retaliation could be a factor in case where plaintiff "charg[ed] a police officer with sexual misconduct that he denie[d]"). Accordingly, courts in this Circuit often permit plaintiffs to use pseudonyms based on the risk of ostracism, harassment, discrimination, or even physical violence. *See, e.g.*, *Roe v. City of Milwaukee*, 37 F. Supp. 2d 1127, 1129 (E.D. Wis. 1999) (permitting use of pseudonym where HIV-positive plaintiff contended disclosure of his identity would result in "ostracism, harassment and perhaps, discrimination"); *Nelson ex rel. Doe v. Milwaukee County*, 712 F. Supp. 1370, 1371 & n.1 (E.D. Wis. 1989) (permitting use of pseudonyms by two children, their father, and their grandparents in suit alleging negligence by County in failing to protect children after physical and sexual abuse by mother's boyfriend was reported to social workers); *Roe v. Borup*, 500 F. Supp. 127, 129-30 (E.D. Wis. 1980) (permitting use of pseudonyms in "case involv[ing] allegedly false charges of sexual abuse of a small child").

A. **Establishment Clause Plaintiffs Routinely Face Harassment and Other Forms of Retaliation, Including Physical Violence**

Plaintiffs here face these same risks. There is an the alarming history of violence and threats of violence against Establishment Clause plaintiffs. For example, after Vashti McCollum brought a suit in 1945 objecting to the practice of allowing public-school students to attend religious classes held in public-school classrooms (*see Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203 (1948)), his house was vandalized, he received hundreds of pieces of hate mail, and his son was physically attacked (*see* ROBERT S. ALLEY, WITHOUT A PRAYER: RELIGIOUS EXPRESSION IN PUBLIC SCHOOLS 84-89 (1996)).

3

In 1981, Joann Bell and Lucille McCord filed suit to block religious meetings and the distribution of Gideon Bibles in their children's schools. *See Bell v. Little Axe Indep. Sch. Dist. No. 70*, 766 F.2d 1391 (10th Cir. 1985). The plaintiffs' children were consequently branded as "devil worshipers." ALLEY, *supra*, at 106. "An upside-down cross was hung on thirteen-year-old Robert McCord's locker." *Id.* And the Bells received threatening telephone calls. "More than once a caller said he . . . was going to break in the house, tie up the children, rape their mother in front of them, and then 'bring her to Jesus.'" *Id.* at 107-08. The threats were far from empty: The Bell home was burned down. *Id.*

In 1994, Lisa Herdahl brought an action challenging prayer practices in her children's schools. *See Herdahl v. Pontotoc County Sch. Dist.*, 887 F. Supp. 902 (N.D. Miss. 1995). As a result, her children were called "atheists and devil worshipers" by their classmates. Stephanie Saul, *A Lonely Battle in Bible Belt: A mother fights to halt prayers at Miss. school*, NEWSDAY, Mar. 13, 1995, at A8. Other children were threatened with beatings by their parents if they were caught talking to, or playing with, the Herdahl children. ALLEY, *supra*, at 177. There were reports that a boycott would be organized against the convenience store where Lisa Herdahl worked. Saul, *supra*, at A08. Herdahl gave up her job "because of threats against her children." ALLEY, *supra*, at 182. And she received death threats and threats that her home would be firebombed. *Id.* at 186.

Similarly, the children of one of the plaintiffs in *School District v. Schempp*, 374 U.S. 203 (1963) (in which Bible reading in the public schools was held unconstitutional), were beaten on their way home from school, and their house was firebombed. ALLEY, *supra*, at 98. The son of the plaintiff in *Chandler v. Siegelman*, 230 F.3d 1313 (11th Cir. 2000) (a challenge to prayer at

4

school-related events), was "harassed at school almost daily." Jonathan Ringel, *Alabama Claims U.S. Court Order Denies Students' Right to Pray*, FULTON COUNTY DAILY REP., Dec. 4, 1998, at 1. And even though she was not a plaintiff but merely a vocal opponent of the school-prayer policy challenged in *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), Debbie Mason received threatening phone calls, was followed home by persons trying to scare her, and saw her husband and children become unable to find work in the town where they lived. Kenny Byrd, *Baptist Family Opposed to Football Prayer Feels Pressure*, BAPTIST STANDARD, June 12, 2000.

In the recent case of *Wynne v. Town of Great Falls*, 376 F.3d 292 (4th Cir. 2004), the plaintiff suffered extreme harassment at the hands of her neighbors after she sued to enjoin a town council from opening its meetings with sectarian prayers. Individuals unhappy with the suit broke into the plaintiff's home and beheaded her pet parrot, leaving behind a note reading, "You're next!" *See* Christina Lee Knauss, *A Quiet Life No More*, THE STATE, Sept. 19, 2004, at D1. In addition, several of the plaintiff's pet cats were killed and her pet dog was beaten. *Id.*

Tyler Deveny, the eighteen year-old plaintiff in *Deveney*[1] *v. Board of Education*, 231 F. Supp. 2d 483 (S.D. W. Va. 2002), endured a beating of his own after successfully challenging the invocation planned for his high-school graduation ceremony. *See* Charles Shumaker, *Student beaten for prayer suit, he says*, CHARLESTON GAZETTE & DAILY MAIL, June 19, 2002, at 6D. A group of eight teens evidently displeased with the outcome attacked Deveny in a public place, with one saying, "Oh, you hate God," before striking Deveny in the face. *Id.*

Unlike Deveny, the Dobrich family — plaintiffs in *Dobrich v. Walls*, 380 F. Supp. 2d 366

_____

[1]     Mr. Deveny's last name was erroneously spelled as "Deveney" in the case caption.

5

(D. Del. 2005) — did not suffer physical violence after challenging their public-school district's practices of permitting teachers to proselytize and distribute Bibles to non-Christian students and of rewarding students who attended school-sponsored Bible clubs. *See* David Bario, *A Lesson in Tolerance*, AM. LAWYER, July 2008, at 122, 122. But the harassment, anti-Semitic taunts, and veiled threats they endured from fellow community members ultimately drove them to move to another county. *Id.*

Plaintiffs challenging religious displays on public property have also experienced retaliation in recent years. Anonka Jocham, the plaintiff in *Jocham v. Tuscola County*, 239 F. Supp. 2d 714 (E.D. Mich. 2003), received threatening phone calls and letters, and was the target of vandalism, after she challenged a private group's erection of a nativity scene on the lawn of her county courthouse. *See* Margaret Downey, *Discrimination Against Atheists: The Facts*, FREE INQUIRY, June 2004, at 41, 43. Margaret Downey wrote about Jocham's experiences after having endured similar harassment herself. *See* Joseph A. Slobodzian & Jonathan Gelb, *Commandments ruling spurs threats*, PHILA. INQUIRER, Mar. 8, 2002, at B1. As founder and president of the Freethought Society of Greater Philadelphia — the organizational plaintiff in *Freethought Society v. Chester County*, 334 F.3d 247 (3d Cir. 2003), a challenge to a Ten Commandments plaque displayed on a county courthouse's exterior wall — Downey received threatening emails and telephone calls, including one ending in the warning: "You're going to get it." *Id.*

And in a case from this Circuit, Judge Cudahy gave this description of events surrounding the substitution of a new, anonymous plaintiff for the original, named one:

> The record indicates that the original plaintiff in this case, Richard Rohrer, was, in effect, ridden out of town on a rail for daring to complain about the City's conduct. The present plaintiff has concealed her identity to avoid suffering the

same treatment. However much some citizens of Ottawa may disagree with the
position that the plaintiffs have taken, however much they may think the plaintiffs
annoying and overlitigious, the conduct of some of them has been deplorable.
This dispute has concerned the display of paintings from the life of Jesus of
Nazareth, who counseled his followers: "But if any one strikes you on the right
cheek, turn to him the other also; and if anyone would sue you and take your coat,
let him have your cloak as well; and if any one forces you to go one mile, go with
him two miles." One would think that those who support this display would be
capable of more charity.

*Doe v. Small*, 964 F.2d 611, 626 (7th Cir. 1992) (Cudahy, J., concurring in the judgment)

(citations omitted).

As Establishment Clause plaintiffs so frequently experience such retaliation, the federal

courts (including the Seventh Circuit and courts within it) often permit such plaintiffs to proceed

anonymously. *See, e.g., Santa Fe*, 530 U.S. at 294 (noting that district court permitted students

and parents challenging student-led prayer at public-school football games to litigate

anonymously); *Doe v. Porter*, 370 F.3d 558, 561 (6th Cir. 2004) (upholding protective order

allowing parents to proceed pseudonymously in challenge to public schools' practice of teaching

Bible as religious truth); *Doe v. County of Montgomery*, 41 F.3d 1156, 1158, 1162 (7th Cir.

1994) (holding that anonymous plaintiffs had standing to challenge display of permanent metal

sign reading, "THE WORLD NEEDS GOD," over main entrance to county courthouse); *Small*,

964 F.2d at 626 (Cudahy, J., concurring in the judgment) (noting that adult plaintiff proceeded

anonymously in Establishment Clause challenge to display of religious paintings in public park);

*Doe v. Vill. of Crestwood*, 917 F.2d 1476, 1477 (7th Cir. 1990) (adjudicating challenge by

pseudonymous plaintiff to constitutionality of municipal festival at which Roman Catholic mass

was held); *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981) (holding that plaintiffs challenging

constitutionality of prayer and Bible-reading exercises in schools were entitled to proceed under

pseudonyms); *Yacovelli v. Moeser*, No. 1:02CV596, 2004 WL 1144183, at *9 (M.D.N.C. May

20, 2004) (holding that "Plaintiffs' personal religious beliefs at stake combined with Defendants'

weak showing of prejudice lean in favor of allowing pseudonyms" in Establishment Clause

challenge to public university's requirement that students read Qu'ran); *Doe v. Harlan County

Sch. Dist.*, 96 F. Supp. 2d 667, 670-71 (E.D. Ky. 2000) (permitting plaintiffs challenging Ten

Commandments display to proceed pseudonymously).

Plaintiffs here fear they will become a footnote to the disturbing history of retaliation

described above. That history, and the common practice among federal courts of permitting

Establishment Clause plaintiffs to proceed anonymously, weigh strongly in favor of granting

Plaintiffs' motion.

## B. Plaintiffs Each Fear Particular Forms of Retaliation Should Their Identities Be Disclosed — For Most, Based on Past Experience

Plaintiffs' particular fears, mostly based on their own experiences in the Elmbrook

School District and Brookfield community, tip the scales even further in their favor.

Plaintiffs represent four families. Doe 1 will graduate from a District high school this

June (Ex. 21 ¶¶ 1, 13), and Doe 2 is Doe 1's parent (Ex. 22 ¶ 1). Doe 3, a minor attending a

District school, is the younger sibling of Doe 1 and the child of Doe 2. *Id.* ¶¶ 1, 9. Does 1 and 2

share the same, principal concern — namely, that disclosure of their involvement in this case

would result in retaliation against Doe 3, who will continue to attend school in the District for

some years. Ex. 131 ¶ 6; Ex. 132 ¶ 6. Does 1 and 2 fear that teachers and school officials would

discriminate against or harass Doe 3 because of their participation in this lawsuit. Ex. 131 ¶ 6;

Ex. 132 ¶ 6. Indeed, Doe 2 believes that Doe 3 has already suffered retaliation for having

8

objected to religious content in one of Doe 3's classes. Ex. 132 ¶ 6. Doe 2 believes that Doe 3's teacher lowered Doe 3's grade in the class because of Doe 3's objections. *Id.* Further, both Does 1 and 2 fear that other students would bully or ostracize Doe 3 if their family's participation in this lawsuit were made public. *Id.*; Ex. 131 ¶ 6.

Doe 2 also worries that other members of Doe 2's family will suffer harassment if their identities are revealed. Ex. 132 ¶ 5. When Doe 2 has discussed Doe 2's views on church-state issues with other community members, they have reacted negatively, and for this reason, Doe 2 now avoids this subject when speaking with acquaintances. *Id.* ¶ 9. Further, after Doe 2 wrote a letter expressing Doe 2's opinion on a controversial topic to the editor of a local newspaper, Doe 2 nonetheless received a harassing response by mail at Doe 2's home, even though the newspaper did not include Doe 2's address when it printed the letter. *Id.* ¶ 8. The writer had taken the time to find out, and now knew, where Doe 2 lived. *Id.* Doe 2 fears that others could do the same if Doe 2's name were made public, and that Doe 2's family could be subjected to harassment at their home. *Id.*

Doe 2 also fears that disclosure of Doe 2's identity would negatively impact Doe 2 professionally. *Id.* ¶ 7. Doe 2 has previously been yelled at and belittled at work for expressing political and social views different from those of Doe 2's superiors in the workplace, while those with conservative viewpoints were allowed to speak freely. *Id.* Doe 2 fears that exposing Doe 2's identity would negatively affect Doe 2's relationships with upper management and could hinder Doe 2's professional advancement and ability to support Doe 2's family. *Id.*

Doe 4 is the parent of children who attend District schools. Ex. 23 ¶ 1. Doe 4 fears that if Doe 4's status as a plaintiff were made public, Doe 4's children would experience bullying

from other students and retaliatory discrimination from school officials. Ex. 133 ¶¶ 5, 7. Doe 4 is also concerned for Doe 4's family's safety, and about harassment in the workplace and retaliation from Doe 4's employer. *Id.* ¶ 5. Doe 4 has shared Doe 4's religious views with only a select few friends at work and believes that if knowledge of Doe 4's humanism were more widespread, Doe 4 might face retaliation from senior managers. *Id.* ¶ 8. Doe 4's recent experience has heightened Doe 4's worries. *Id.* ¶ 6. In Doe 4's neighborhood and at work, Doe 4 has heard many people discussing this lawsuit, and many have disparaged the plaintiffs. *Id.* Doe 4 recently overheard persons in senior positions at Doe 4's workplace discussing a letter published in a local newspaper, in which the writer opposed holding graduations at Elmbrook Church. *Id.* ¶ 8. The managers criticized the letter's writer and made anti-atheist statements. *Id.* If senior leaders in Doe 4's workplace learn that Doe 4 does not share their religious beliefs and that Doe 4 is a plaintiff in this case, Doe 4 fears they would retaliate against Doe 4. *Id.*

Doe 5 fears that if Doe 5's identity were disclosed, Doe 5 and Doe 5's family would experience social ostracism and economic injury. Ex. 134 ¶ 5. Doe 5 is also concerned for the family's safety because Doe 5 believes that many people react emotionally to controversies involving religion and consequently do rash things. *Id.* Based on items Doe 5 has viewed in the local media, Doe 5 understands that many community members have reacted negatively to this lawsuit. *See id.* ¶¶ 6-7. Doe 5 has read many comments from community members that attack and sometimes subtly threaten Doe 5 and the other plaintiffs. *Id.* ¶ 7; *see infra* pp. 14-16. Doe 5's own past experiences, and those of Doe 5's child, Doe 7, have also contributed to Doe 5's concern that disclosure of Doe 5's identity would cause Doe 5's family to suffer harassment. Ex. 134 ¶ 10. When Doe 5 previously expressed opposition to holding graduations at Elmbrook

Church in the presence of other Brookfield parents, those parents responded with anger and resentment — some, in raised voices. *Id.* ¶ 11. And after Doe 5 complained to the school district about religious content in one of Doe 7's classes, that class's teacher did not permit Doe 7 to participate in an activity over which the teacher had authority. *Id.* ¶ 12. Doe 5 believes that the teacher retaliated against Doe 7 because of Doe 5's complaint. *Id.*

Does 5 through 8 also fear that disclosure of their identities would negatively impact Does 5 and 6 in their professions. *Id.* ¶ 13; Ex. 135 ¶ 5; Ex. 136 ¶ 9; Ex. 137 ¶ 5. Doe 5 is a small-business owner and has some regular clients. Ex. 134 ¶ 15. Doe 5 fears that if Doe 5's involvement in this lawsuit were known, some clients would cease to patronize Doe 5's business, causing Doe 5 potentially substantial economic harm. *Id.*; *accord* Ex. 136 ¶ 9. Some years ago, Doe 5 wrote a letter to the editor of a local newspaper in which Doe 5 expressed Doe 5's opinion on a controversial topic. Ex. 134 ¶ 15. After this letter was published, a long-time client stopped working with Doe 5, and Doe 5 believes this occurred because of the letter's publication. *Id.*

Further, many of Doe 6's colleagues are fervently religious, and Doe 6 has not disclosed Doe 6's lack of religious faith to these individuals for fear that it would disrupt their working relationships. Ex. 135 ¶¶ 6-7. Does 5 through 8 fear that, if Doe 6's identity were revealed, these coworkers might criticize, ostracize or even retaliate against Doe 6 in the workplace. Ex. 134 ¶ 14; Ex. 135 ¶ 5; Ex. 136 ¶ 9; Ex. 137 ¶ 5. Doe 6 manages a large number of subordinates and worries that if they learned that Doe 6 is an atheist — not to mention a plaintiff in this case — the disclosure would disrupt their working relationships. Ex. 135 ¶ 6. Several of Doe 6's peers and supervisors frequently speak about the importance of belief in God and have family members who are or were ministers. *Id.* ¶ 7. If they learned of Doe 6's atheism and participation

11

in this lawsuit, Doe 6 believes this knowledge would, at best, permanently damage their working relationships, and might even lead to discrimination or jeopardize Doe 6's employment. *Id.* Given the current economic recession, Doe 6 is concerned that Doe 6's name would be added to a layoff list. *Id.* ¶ 5.

Doe 6's past experiences heighten Doe 6's concerns about retaliation and harassment. Ex. 135 ¶ 8. Some years ago, Doe 6 attended a meeting hosted by one of the Brookfield high schools at which parents and students were invited to discuss having graduation at Elmbrook Church. *Id.* ¶ 9. When a few individuals spoke against holding graduation there, many others became angry and dismissive, expressing incredulity that those opposed to the plan were non-believers. *Id.* Their disdain for minority views made Doe 6 feel helpless and alone. *Id.* Doe 6 also recalls that when Doe 5 wrote a letter expressing Doe 5's opinion on a controversial topic to the editor of a local newspaper, Doe 5 received a response by mail at home from a woman who made clear that Doe 5's opinions conflicted with her religious beliefs. *Id.* ¶ 10. The newspaper had not printed Doe 5's address along with the letter, and Doe 6 felt uncomfortable that this woman had taken the time to find out, and now knew, where they lived. *Id.*

Similarly, maintaining anonymity is important to Doe 7 because Doe 7 fears that if Doe 7's involvement were made public, Doe 7 would experience harassment and retaliatory discrimination. Ex. 136 ¶ 5. This fear stems principally from Doe 7's past experiences. *Id.* In Fall 2004, when Doe 7 was a senior at a Brookfield high school, the school conducted a vote among the members of the senior class on where to hold graduation. *Id.* ¶ 6. In conjunction with the vote, Doe 7 opposed holding the graduation at Elmbrook Church. *Id.* In response, Doe 7's peers verbally attacked and ostracized Doe 7. *Id.* ¶ 7. When Doe 7 would walk into a classroom

12

or the cafeteria, Doe 7 could feel that everyone was staring at Doe 7. *Id.* In classes, fellow students repeatedly challenged and belittled Doe 7's views, demanding to know why Doe 7 "had to ruin a good thing" and insisted on "overreacting." *Id.* At first, Doe 7 maintained Doe 7's opposition to graduating in the Church and tried to explain why graduating there was inappropriate. *Id.* As a result, other students ostracized Doe 7, and Doe 7 felt that by being different, Doe 7 had committed social suicide. *Id.* Eventually, Doe 7 succumbed to the social pressure to conform and started telling Doe 7's peers that Doe 7 did not care much about the location of the graduation, even though Doe 7 did. *Id.*

A school official also criticized Doe 7's opposition to graduating in a church. *Id.* ¶ 8. When Doe 7 met with the official for advice on a school-related matter, the official wanted to talk about Doe 7's complaints about holding graduation at Elmbrook Church. *Id.* The official asked Doe 7 what Doe 7 thought "the problem" was, in a tone that made Doe 7 feel Doe 7 had done something wrong. *Id.* When the official persisted in questioning Doe 7 about the matter, using a critical tone of voice, Doe 7 felt pressured to disavow Doe 7's opposition. *Id.* Doe 7 knew that Doe 7 would need to consult this school official on future occasions, and Doe 7 felt that Doe 7 had to express agreement with the majority viewpoint to secure the official's approval. *Id.* Doe 7 felt compelled to deny who Doe 7 was as a person. *Id.* This experience was humiliating for Doe 7, and if Doe 7's identity were disclosed, Doe 7 fears that Doe 7 would endure such experiences again. *Id.*

If Doe 7's role as a plaintiff in this suit were publicly known, Doe 7 also fears that Doe 7 would have difficulty finding employment. Ex. 136 ¶ 8. Doe 7 is a college student, and when Doe 7 graduates, Doe 7 expects to look for jobs in the Milwaukee area. *Id.* Doe 7 is concerned

13

that employers may be unwilling or less likely to hire Doe 7 because they disagree with this lawsuit. *Id.* Doe 8 is also concerned that potential employers may discriminate against Doe 8 based on Doe 8's role in this case. Ex. 137 ¶ 6.

Finally, Doe 9, whose children attend schools in the District, fears that if Doe 9's identity were revealed, Doe 9's children would experience harassment and retaliatory discrimination. Ex. 138 ¶ 5. Doe 9 is concerned that many teachers and administrators may strongly favor the District's practice of holding graduations in Elmbrook Church, particularly because Doe 9 understands that several District administrators are members of the Church. *Id.* ¶ 6. Doe 9 is an atheist, and if this suit succeeds, Doe 9 fears that these school officials will view Doe 9's children as "the children of that godless bastard that took away our rights," and that Doe 9's children may be judged, graded, and afforded or denied opportunities based on Doe 9's decision to take part in this suit. *Id.* Because discrimination can be very subtle, Doe 9 believes it would be virtually impossible to determine whether any school official who made an adverse decision with respect to Doe 9's children had been influenced by his or her knowledge of Doe 9's involvement in this lawsuit. *Id.* ¶ 7.

Doe 9's own past experience heightens Doe 9's concern. *Id.* ¶ 8. Doe 9 has previously spoken out on controversial issues in letters to the editor of a local newspaper. *Id.* Though Doe 9's address was never published alongside the letters, strangers who read those letters discovered where Doe 9 lives and mailed responses attacking Doe 9's position. *Id.* Doe 9 believes that if Doe 9's identity as a plaintiff were revealed, persons angered by this lawsuit could easily locate Doe 9's home. *Id.*

Community response to this case adds credence to Plaintiffs' fears. Many community

14

members have already demanded to know who among their neighbors has filed this suit, and the tone of these demands suggests their reasons are less than charitable. *See, e.g.*, Ex. 139 at 3 ("If forced to moved [sic] to a hot crowded gym, then the 330+ families can discuss their displeasure with the 9 families who filed the lawsuit, if these cowards would identity themselves!"); *id.* at 4 ("The people who have filed this lawsuit are cowards. If you want to make a fuss about this nonsense - stand up and be seen. Show us who you are and defend yourselves."); *id.* at 5 ("I also agree that the cowardly families who are participating in this lawsuit should be named."); *id.* at 7 ("Also, why is the coward hiding ... if you're so proud of your cause, step forward and receive your just recognition."); Ex. 140 ("If they truly believed in their cause, why aren't they comfortable identifying themselves? What if the other 99.5% of the graduates or their families would like to offer, God forbid (pun intended), a short, private, prayer for their future?").

Other comments published on the internet about this case similarly exhibit strong hostility against the plaintiffs. *See, e.g.*, Ex. 139 at 2 (referring to Plaintiffs and counsel as "a group of people whose only real purpose is to foment hatred against all people of faith"); *id.* ("the kind of people who make issues out of things like this are just nut jobs who find ways to be 'offended' by just about anything"); *id.* at 5 ("A tiny, insane minority with an anti-Christian attitude should never be allowed to tyrannize the majority."); *id.* ("This argument is idiotic. A true atheist would never be threatened by being in a church since he does not believe in God . . . . My guess is that these people really do have an inkling that God exists and are just too stubborn [sic] to admit it."); *id.* at 6 ("The people behind this suit are morons . . . . The kids of these parents should be handed their diplomas at school and told to stay home, if it's so abhorent [sic] for them to step foot in a church."); *id.* at 7 ("These idiots will eventually rot in hell...how incredibly stupid to

15

make this an issue!!!"); *id.* at 10 ("Hold it at the church and start the ceremony with the Our Father. Let the non beleivers [sic] leave!!!"). The palpable danger of retaliation Plaintiffs would face if their identities were made public presents a compelling reason for granting them leave to proceed anonymously. *See City of Chicago*, 360 F.3d at 669.

## II. Plaintiffs' Use of Pseudonyms Is Necessary to Protect the Privacy of Children and Other Particularly Vulnerable Parties

The Seventh Circuit has also held that minors and "other particularly vulnerable parties" may litigate using pseudonyms when necessary to protect their privacy. *Blue Cross*, 112 F.3d at 872; *see also Doe v. St. Clair County*, Civil No. 07-142-DRH, 2007 WL 1097945, at *1 (S.D. Ill. Apr. 12, 2007) (permitting child plaintiffs who alleged sexual abuse by juvenile detention facility guard to proceed anonymously due to their ages, "their detention status, the nature of the alleged wrongs, and the tremendous potential impact of being subject to public scrutiny and embarrassment"); *City of Milwaukee*, 37 F. Supp. 2d at 1129 (holding that "plaintiff's HIV-positive status," which was known only to "limited family, friends and medical personnel," "[wa]s a compelling reason for allowing him to proceed under a pseudonym"). Here, the privacy of both children and other particularly vulnerable parties — religious minorities — is at stake.

First, three of the four families that Plaintiffs represent include young children. As noted above, Plaintiff Doe 3 is a minor, and Does 1 and 2 are, respectively, Doe 3's sibling and parent. If even one of their identities became public, Doe 3's privacy would be shattered. Similarly, as Does 4 and 9 are each parents of minor children, disclosure of either parent's identity would necessarily "out" the children. *See, e.g.*, *St. Clair County*, 2007 WL 1097945, at *1 (declining to reveal adult plaintiffs' identities in suit alleging sexual abuse of their children because

16

"revelation of their names would likely reveal their daughters' identities").

Establishment Clause cases involving children raise particular privacy concerns because minors are especially susceptible to social pressure to conform (*see Lee v. Weisman*, 505 U.S. 577, 593-94 (1992)) and are consequently less likely to openly challenge a popular governmental practice, no matter how deeply it offends them, for fear of standing out. Moreover, depending on age and temperament, children may lack the emotional maturity to cope with fierce community opposition and social ostracism, or the physical ability to protect themselves against bullying and retaliatory violence.

The District's practice of holding graduation ceremonies at Elmbrook Church is quite popular among its student body. *See, e.g.*, Ex. 84; Ex. 91; Ex. 93 at P325; Ex. 97 at P318. And this lawsuit, which challenges that practice, has generated intense opposition and debate in the Brookfield community. *See* Ex. 139 (more than 280 responses to internet community forum query, "Should the school district hold '09 graduations Elmbrook Church?"); Ex. 140 (letter to the editor supporting church-graduations); Ex. 141 (letter to the editor opposing church-graduations). Whatever the outcome of this suit, unless granted anonymity, Doe 3 will pass through adolescence marked as one of the principal catalysts for this passionate disagreement, in a community where many are vociferously hostile to the case. The children of Does 4 and 9 will likewise become the targets of opprobrium by their peers if their parents' identities are revealed. Permitting their parents to litigate anonymously is necessary to protect the children's privacy. *See Blue Cross*, 112 F.3d at 872.

What is more, the law considers religious minorities to be a particularly vulnerable class. *See, e.g.*, *Bell v. Duperrault*, 367 F.3d 703, 712 (7th Cir. 2004) (Posner, J., concurring) (in Equal

17

Protection Clause case, noting that Clause's purpose is to "protect the vulnerable," including religious minorities); *Lemke v. Black*, 376 F. Supp. 87, 89 (E.D. Wis. 1974) (noting that the Establishment Clause's "most obvious purpose" "was to protect the rights of religious minorities"). And Plaintiffs here all fall within that category. A majority of students in the Elmbrook School District, and a majority of Brookfield residents, are Christians. Ex. 21 ¶ 12; Ex. 132 ¶ 9.[2] But Does 1, 2, and 3 subscribe to a non-Christian faith; indeed, Doe 2 is very conscious that Doe 2's family members are part of a religious minority in the Brookfield community. Ex. 21 ¶ 3; Ex. 22 ¶¶ 4, 9; Ex. 132 ¶ 9. Does 4 through 9 likewise are non-Christians: Doe 4 is a humanist, and Does 5 through 9 are atheists. Ex. 23 ¶ 2; Ex. 24 ¶ 18; Ex. 25 ¶ 8; Ex. 26 ¶ 4; Ex. 27 ¶ 3; Ex. 138 ¶ 6.

Courts recognize that religion is "a particularly sensitive topic." *Porter*, 370 F.3d at 560. As discussed above, disclosure of Plaintiffs' identities "could subject them to considerable harassment" (*id.*) — even more so here, where Plaintiffs espouse minority views. The community is divided over Plaintiffs' suit, and many of those who favor holding graduations at Elmbrook Church have attacked and belittled Plaintiffs' religious objections to the practice. *See supra* pp. 15-16. This atmosphere of religious divisiveness enhances Plaintiffs' vulnerability and magnifies the importance of safeguarding their privacy through use of pseudonyms. *See Blue Cross*, 112 F.3d at 872.

---

[2]     In fact, though some of its members likely live in other communities, Elmbrook Church alone boasts at least 4,000 members — equivalent to over sixty percent of Brookfield's population of 6,400. *See* Ex. 142 at 3.

18

**III.    Plaintiffs' Interests In Maintaining Their Anonymity Far Outweigh Any Potential for Prejudice to Defendant and the Public's Interest in Disclosure**

Ultimately, the Court must balance the potential harm to Plaintiffs posed by disclosure of their identities against the public interest in open judicial proceedings "and the possible prejudice to the opposing party from concealment." *City of Chicago*, 360 F.3d at 669. As explained above, Plaintiffs have compelling reasons for maintaining their anonymity in this case: to guard against serious risks of harassment, social ostracism, economic injury, governmental retaliation, and physical violence to themselves and their families; and to protect the privacy of children and religious minorities. Plaintiffs' interests far outweigh any on the other side of the scale.

First, although the Seventh Circuit has noted that "[t]he concealment of a party's name impedes public access to the facts of the case," this abstract and generalized interest must yield where, as here, a plaintiff demonstrates a concrete and particular interest in anonymity. *See id.* Indeed, here, the public's manner of expressing its interest in disclosure lends credence to Plaintiffs' fears of retaliation should their identities be revealed. *See supra* pp. 14-16. And, other than Plaintiffs' names, nothing in this case has been filed under seal. The public thus can fully learn about the facts relating to the constitutionality of the District's conduct — the facts that should concern the public most.

In deciding whether allowing a plaintiff to proceed anonymously will cause prejudice to a defendant, courts consider whether the defendant will suffer unfair damage to its reputation, whether there will be difficulties in discovery, and the proceeding's fundamental fairness. *See, e.g.*, *EW v. N.Y. Blood Ctr.*, 213 F.R.D. 108, 112 (E.D.N.Y. 2003). Here, the defendant will not suffer any unfair damage to its reputation: it is a political entity, not an individual; it is not being

19

accused of any act involving moral turpitude; and there is no dispute that it holds graduations in a church — the question is simply whether such graduations are constitutional. *Cf. Doe v. Smith*, 429 F.3d 706, 710 (7th Cir. 2005) (noting that named defendant would face disgrace if anonymous plaintiff's allegations of sexual misconduct could be substantiated). The District will not suffer prejudice in discovery, for an appropriate protective order can address any difficulties that might arise in discovery as a result of Plaintiffs' anonymous status. And because the primary issue in this case is whether the District's conduct is constitutional — not the conduct of the plaintiffs — allowing the case to proceed anonymously will not hamper the proceeding's fundamental fairness.

Furthermore, courts in some other Circuits consider two additional factors in determining whether plaintiffs may litigate anonymously, both of which weigh in Plaintiffs' favor here. First "the plaintiff's interest in proceeding anonymously is considered particularly strong" in cases challenging a statute or governmental policy because "[i]n such circumstances the plaintiff presumably represents a minority interest (and may be subject to stigmatization), and there is arguably a public interest in a vindication of his rights." *EW*, 213 F.R.D. at 111; *see also Porter*, 370 F.3d at 560 (alluding to this principle in Establishment Clause case); *Stegall*, 653 F.2d at 185-86 (applying this principle in Establishment Clause case). Here, as explained above, Plaintiffs have challenged a popular governmental action. They fear that disclosure of their identities would result in harassment, ostracism, economic injury, governmental retaliation, and even physical harm. Disclosure would therefore likely chill Plaintiffs' exercise of their constitutional rights and deter other individuals from challenging popular, though unconstitutional, practices.

20

Second, courts require that would-be pseudonymous plaintiffs endeavor to protect their own anonymity.  *See, e.g.*, *Doe v. Hartz*, 52 F. Supp. 2d 1027, 1046, 1048 (N.D. Iowa 1999); *Doe v. Provident Life & Acc. Ins. Co.*, 176 F.R.D. 464, 467-68 (E.D. Pa. 1997).  Here, Plaintiffs' identities are known only to counsel, their immediate family members, the Court, and to some extent, each other.  *See* Ex. 131 ¶ 3; Ex. 132 ¶ 3; Ex. 133 ¶ 3; Ex. 134 ¶ 3; Ex. 135 ¶ 3; Ex. 136 ¶ 3; Ex. 137 ¶ 3; Ex. 138 ¶ 3.  Moreover, Plaintiffs are not public figures and have made no public statements about this case.  Hence, they have taken all reasonable measures to maintain their anonymity.

Thus, both the factors enumerated by the Seventh Circuit and those identified by other courts weigh in favor of granting anonymity here.  By any measure, then, Plaintiffs have shown "that the harm to the plaintiff[s]" from disclosure of their identities "exceeds the likely harm from concealment."  *See City of Chicago*, 360 F.3d at 669.

21

**CONCLUSION**

For the reasons set forth above, Plaintiffs' motion for leave to proceed using pseudonyms should be granted.

Respectfully submitted,

/s/ Alex J. Luchenitser
Alex J. Luchenitser

Ayesha N. Khan (D.C. Bar No. 426836)
Alex J. Luchenitser (D.C. Bar No. 473393)
Elizabeth J. Stevens (D.C. Bar No. 974980)
AMERICANS UNITED FOR SEPARATION
  OF CHURCH AND STATE
518 C Street, NE
Washington, DC 20002
Tel:  (202) 466-3234
Fax: (202) 466-2587
*khan@au.org / luchenitser@au.org /*
  *stevens@au.org*

James H. Hall, Jr. (Wis. Bar No. 1004338)
F. Thomas Olson (Wis. Bar No. 1010170)
HALL LEGAL, S.C.
759 North Milwaukee Street
Milwaukee, WI 53202
Tel:  (414) 273-2001
Fax: (414) 273-2015
*jhh@hall-legal.com / folson@hall-legal.com*

*Attorneys for Plaintiffs*

Dated: May 12, 2009

22