DOES 1, 7, 8, AND 9, individually;
DOES 2, 4, 5, AND 6 individually;
  and as taxpayers; DOE 3, a minor,
  by DOE 3's next best friend, DOE 2,

            Plaintiffs,

                                        Case No. 09-C-0409

   v.

ELMBROOK JOINT COMMON
SCHOOL DISTRICT NO. 21,

            Defendant.

---

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

## **INTRODUCTION**

"[G]overnmental neutrality between religion and religion, and between religion and nonreligion" is the "touchstone" of the Establishment Clause. *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 860 (2005). The "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 839 (1995). Moreover, "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Bd. of Education of Westside Community Schools v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356 (1990) (opinion of O'Connor, J.). The court "must not strike [state action] down

if it is within the state's constitutional power even though it approaches the verge of that power." *Everson v. Board of Education*, 330 U.S. 1, 16 (1947).

In this case, "following neutral criteria and evenhanded policies," the School District of Elmbrook ("School District" or "District," incorrectly captioned as the Elmbrook Joint Common School District No. 21) selected a venue for annual graduation for its two high schools. It is undisputed that the commencement proceedings themselves are purely secular. However, the venue that was selected, based on neutral, entirely secular criteria, is a Christian church.

Holding graduation at Elmbrook Church does not violate the Establishment Clause. First, neither the Supreme Court nor any circuit court of appeals has ever found that holding graduation exercises in a sectarian facility is unconstitutional. In fact, courts that have disposed of the issue on the merits have uniformly upheld the practice. Second, under the circumstances of this case, the practice satisfies the three-pronged *Lemon* test. The arm's length facility use agreement between the School District and Elmbrook Church has a primarily secular purpose, a primarily secular effect, and results in only incidental entanglement, if any, between religion and government. Third, the practice does not constitute coercion because no participant is required to participate in any coerced group prayer, hymn, or other "overt religious exercise." Finally, no reasonable, objective observer, aware of the history and context of the practice, would conclude that the School District is endorsing or adopting the private views of Elmbrook Church as the School District's own.

Clearly, Plaintiffs find the views of Elmbrook Church offensive. Because of these offensive views, Plaintiffs claim, it is inappropriate to hold graduation exercises at Elmbrook Church. In effect, Plaintiffs ask the School District to exclude an otherwise appropriate venue from consideration purely on the basis of the organizer's religious views, or

worse, to censor the organizer's private religious speech. Either action would constitute impermissible viewpoint discrimination in violation of the First Amendment's Free Speech Clause.

Plaintiffs now move for the extraordinary remedy of a preliminary injunction to enjoin the School District from holding graduation at Elmbrook Church. Because use of Elmbrook Church based on neutral, secular criteria does not violate the Establishment Clause, and because exclusion of Elmbrook Church on the basis of its views would constitute unconstitutional viewpoint discrimination, Plaintiffs are not likely to prevail on their claims. In addition, in light of Plaintiffs' delay in seeking a preliminary injunction, the public interest is not served by rearranging two high school graduations – each of which affects some 3000 graduates, family members, friends, and School District personnel – at the last minute. Plaintiffs' motion should be denied.

<u>**STATEMENT OF FACTS**</u>

High school graduation exercises for two of the School District's high schools, Brookfield East High School ("Brookfield East") and Brookfield Central High School ("Brookfield Central"), are scheduled to take place at the Elmbrook Church on June 6 and 7, 2009, respectively. Neither Brookfield East nor Brookfield Central have plans to hold their 2009 graduation exercises elsewhere, and neither school has scheduled any facility, including the Waukesha County Expo Center, as a "back-up facility" as Plaintiffs' suggest.

A. <u>**Historic Use of Elmbrook Church for Graduation Exercises**</u>.

Prior to the 2000 graduations, graduation exercises for Brookfield East and Brookfield Central were held in the schools' respective gymnasiums. During the 1999-2000 school year, senior class officer at Brookfield Central requested that their graduation exercises be held at

Elmbrook Church. The class officers wrote the following explanation for their desire to hold graduation exercises at the Elmbrook Church.

> On behalf of the Senior Class of Brookfield Central High School we would like to request your permission to make a few changes with respect to our graduation ceremony that will take place in June, 2000. The nature and the rationale for the changes are as follows:
>
> The first change deals with the starting time for the graduation ceremony. ….
>
> The second change deals with the venue of the graduation ceremony. We request that the site of the ceremony be changed to an auditorium in Elmbrook Church, located on Barker Road. As you know, the graduation ceremony has been held in the Brookfield Central Gymnasium for the past several years. The seating in the Gymnasium is very limited, causing the atmosphere to be very busy and perhaps even chaotic. On top of the crowding, the temperature in the Gymnasium gets extremely hot in the month of June. We feel that the Elmbrook Church will overcome the limitations of space and temperature control, providing ample comfortable seating and an air-conditioned room. The cushioned seats are also much more comfortable in comparison to the hard, wooden bleachers available at school. In addition, there are more than enough parking spaces and excellent handicap facilities available at the church.
>
> We are not making these decisions without the consultation of the entire class. During the Senior Class Assembly held on the first day of the school, a vote was taken to get students' feedback on the proposed change in venue for the graduation ceremony. There were no objections that arose from the proposal. In fact, the students seemed to be very excited about having a comfortable and professional atmosphere during their graduation ceremony-an important turning point in their lives.
>
> Please do consider our proposals with respect to our graduation ceremony. We would be delighted if our requests were taken into serious consideration, so that the graduation ceremony of the class of 2000 will be much more pleasant than it has been in the past. We hope that our advance notice will allow you enough time to make a well-thought decision. We thank you graciously for you time.

Then-Principal of Brookfield Central Jim Briscoe approved the students' request. District Superintendent Matt Gibson received the students' request. Because he felt the decision where to hold graduation was best left to each school and because he saw no grounds to overrule the decision, he let Principal Briscoe's decision stand.

Case 2:09-cv-00409-CNC   Filed 05/22/09   Page 4 of 45   Document 26

Brookfield Central held its graduation exercises at the Elmbrook Church in 2000 and it was a huge success. Each year since, Brookfield Central has held its graduation exercises at Elmbrook Church. Between 2000 and 2002, Brookfield East continued to hold its graduation exercises in Brookfield East's high school's gymnasium. However, after observing and experiencing the attributes of the Elmbrook Church venue as a result of Brookfield Central's use of the Elmbrook Church for its graduation exercises, beginning in the 2001-2002 school year seniors at Brookfield East decided to consider holding their graduation exercises in an alternative venue other than the school's gymnasium. Similar to their Brookfield Central counterparts, Brookfield East's seniors considered multiple venues for their graduation exercises, narrowed the choices down to two or three choices, and voted. Their vote was advisory. Brookfield East Principal Dr. Joe Schroeder made the final decision based on the students' vote, and each year he approved the senior's choice of venue. Again, each year Superintendent Gibson left that decision intact.

Prior to the fall of 2006, both Brookfield Central and Brookfield East followed this process whereby students held an advisory vote on a location to hold their graduation exercises, and each year in which the seniors voted on a venue, the overwhelming majority of students voted in favor of holding the graduation at the Elmbrook Church. In each such year, the Principals at the time approved of the students' choice of venue. In each such year, Superintendent Gibson left those decisions intact.

Beginning in the fall of 2006, the Principal of Brookfield East Brett Bowers and the Principal of Brookfield Central Don LaBonte met with the senior class to discuss graduation. The officers were strongly in favor of continuing to hold graduation at the Elmbrook Church. The senior officers did not believe an advisory vote was warranted because of the overwhelming

5

approval of the Elmbrook Church in the prior years. (Brookfield East's last student vote taken during the 2005-2006 school year resulted in 97% of Brookfield East's seniors voting in favor of the Elmbrook Church.) Given the students' strong preference and the historic support of the venue, the Principals agreed with the officers and finalized the decision to hold the 2007 graduation at the Elmbrook Church. A similar process has been followed in each school year since the fall of 2006, including for the current senior class. Over the years, multiple school districts and other educational institutions have used Elmbrook Church for their graduation exercises. At various times, staff have had difficulty scheduling the Elmbrook Church for the high schools' graduation exercises due to the demand for that facility at that time of year. Because of the demand for use of Elmbrook Church and because of the consistent and repeated desire of School District seniors (either via an advisory vote or from class officers) to hold graduation at the Elmbrook Church, it became clear that the schools needed to reserve Elmbrook Church well in advance of the graduations. In recent years, staff has had to reserve Elmbrook Church for the graduation exercises as close as possible to one year in advance of the exercises.

      **B.**    **<u>Nature of Graduation Exercises</u>.**

Graduation exercises for both Brookfield Central and Brookfield East are conducted by School District personnel. No church official or employee is involved in conducting, presiding over or speaking at the exercises. Programs for the graduation exercises, which list the agenda, speakers and names of the graduates, are handed out by School District personnel or student or parent volunteers, not church officials or employees. This is the only literature distributed during the graduation exercises

6

The graduation exercises are entirely secular. School District employees speak, secular music is played, diplomas are presented to students, and several students give speeches. No part of the exercises is religious in any way. The exercises last between one and one-half to two hours.

In the last several years, the Elmbrook Church has removed all non-permanent religious banners and symbols that are on the stage in the Auditorium and in the lobby. The Elmbrook Church has confirmed that it will do so again this year. However, the Elmbrook Church is unwilling to remove or cover up any permanent religious symbols for the School District or any other person or entity renting the Elmbrook Church. Each year, Brookfield Central and Brookfield East hang their school banners in the Auditorium and in the lobby.

The School District arranges for a professional photographer who takes pictures of each student as the student receives his or her diploma. The photographs are taken at a close-up range. None of the religious iconography enumerated in the Plaintiffs' submissions to the Court are visible in these photographs. These professional photographs are available for purchase by students and their families. After the graduation exercises, the Elmbrook Church is open and available for students and their families to take photographs inside and/or outside the facility.

In addition, the School District videotapes Brookfield Central's graduation exercises. The video is taken at mostly a close-up range. The video captures the entire commencement proceeding, from the officiants, speakers and students receiving their diplomas. The video is broadcast on the District's local cable channel and available for purchase by the public.

C.   **Size of Graduating Classes and Attendance at Graduation.**

Brookfield Central's senior class is approximately 360 students. Brookfield East's senior class is approximately 340 students. Based on recent historic attendance at the schools' graduation exercises, the School District anticipates approximately 3,000 persons (including the graduates) will attend each schools' commencement this year.

D.   **Current Construction: Graduations Will Return to the New Field House in 2010.**

In April of 2008, voters in the School District passed a referendum approving a general obligation bond in an amount not to exceed $62,190,000 for the public purpose of paying the cost of renovating and adding to Brookfield East and Brookfield Central, making related site improvements, and acquiring related equipment. A similar referendum previously failed. As a result of passage of the referendum, Brookfield East and Brookfield Central are being remodeled and are now under construction.

The construction includes remodeling the existing gymnasiums and creating a new School District field house with capacity of 3,500 persons, which will be more than sufficient to have Brookfield East and Brookfield Central's commencement exercises return to the School District without the need to issue tickets for admission to the ceremony. The School District expects construction of the new field house will be sufficiently completed in time for the 2010 graduation. The new gymnasium will also be air-conditioned, and have ample handicapped seating and parking.

*Both Brookfield Central's and Brookfield East's graduation exercises in 2010 and thereafter will be held in the School District's new field house.* Thus, this is the last year either school will hold its graduation exercises at Elmbrook Church.

Case 2:09-cv-00409-CNC   Filed 05/22/09   Page 8 of 45   Document 26

The School District does not want to issue tickets to the exercises and thus limit the number of persons its seniors can invite and limit and/or prohibit other students and members of the public from attending the exercises. Both of the gymnasiums for Brookfield Central and Brookfield East are under construction; as a result, the School District cannot use either gymnasium to hold graduation exercises this year. Even if it could, the limitations are obvious. The capacity of both gymnasiums is approximately 1700. Thus, neither gymnasium is sufficient to hold the graduation exercises without having to issue tickets for the ceremony. Based on the number of seniors both schools have this year, the number of persons involved in the ceremony itself, and the size of both gymnasiums, the School District would need to limit each senior to bringing approximately three (3) guests to their graduation ceremony, again assuming construction did not prevent the use of the gymnasiums. The School District would also need to prohibit other students in the school and members of the public other than those who have a ticket from attending the ceremony.

Neither Brookfield Central nor Brookfield East's gymnasiums are air conditioned. The seating in both gymnasiums is limited to folding chairs on the floor and bleacher seating against the walls. In addition, due to the construction and remodeling taking place right now at the schools, parking would be severely limited near the schools.

E.    **Attributes of Elmbrook Church.**

As enumerated in the students' letter in 1999, the Elmbrook Church offers many amenities in terms of Brookfield Central's and Brookfield East's graduation exercises over other venues. These attributes include:

(a)    Ample seating capacity (3,200 person capacity) that will not require the School District to limit the number of persons each senior can invite to the ceremony;

9

(b)     The proximity to each school (4.5 miles from Brookfield Central and 9.5 miles from Brookfield East);

(c)     Ample and free parking;

(d)     Air conditioning;

(e)     Handicapped accessibility;

(f)     Excellent video and audio technology[1];

(g)     More comfortable seating (padded seats) and better viewing (balcony and Auditorium seating) for many observers; and

(h)     Reasonable price.[2]

These considerations make the Elmbrook Church the clear choice among any alternative venues.

**F.      Consideration of Alternative Venues for Graduation Exercises.**

In the fall of 2008, the current Principals of Brookfield East (Brett Bowers) and Brookfield Central (Don LaBonte) investigated potential alternative venues to Elmbrook Church for high school graduations in May of 2009.  Miller Park, Wisconsin Lutheran College and the Petit Center were either unavailable or too costly.  The Waukesha County Expo Center did not return Principal LaBonte's phone call, but regardless that facility was previously unavailable for a spring 2008 graduation and that facility is smaller (capacity of 1,800) and more expensive than the Elmbrook Church.  Even if that facility was available, it would require the schools to issue tickets for the graduation exercises, limiting the number of tickets per student to approximately

_____

[1]  The Elmbrook Church has two "jumbotron" screens which display close-up images of the graduates and speakers during the ceremony.

[2]  The approximate cost to hold the high schools' graduation ceremonies in 2009 is $2,000 per school.  Given the costs associated with holding the graduation ceremonies on District property, the School District actually spends less money by holding the graduation ceremonies at the Elmbrook Church than it would if it held the ceremonies in any existing District facility, assuming one were available.

3, as compared to the historic attendance at the Elmbrook Church for the exercises, which equates to approximately 8 persons per senior.

## TABLE OF CONTENTS OF ARGUMENT

I. **Holding The Graduation At Elmbrook Church Does Not Violate The Establishment Clause Under The Circumstances.** ..................................................................................13

    A. Based On Neutral, Secular Criteria, Elmbrook Church Is The Most Appropriate Facility For Graduation Exercises. ...................................................................................13

    B. The "Touchstone" Of The Establishment Clause Is "Governmental Neutrality Between Religion And Religion, And Between Religion And Nonreligion." ..................15

    C. Holding Graduation At Elmbrook Church Satisfies The *Lemon* Test. ........................16

    D. The Graduation Proceeding Itself Is Undisputedly Secular, And Therefore No Person Has Been Coerced To Participate In Any "Religious Exercise" Or "Formal Religious Observance." ...................................................................................................................21

    E. No Reasonable ObserverWould Conclude The School District Is Endorsing The Views Of Elmbrook Church By Holding Graduations At Elmbook Church In June of 2009 ..................................................................................................................................25

    F. The School District Does Not Violate The Establishment Clause By Paying Market-Rate Facility Use Fees For The Provision Of Secular Services. .......................................34

II. **Excluding Elmbrook Church Solely On The Basis Of Its Religious Viewpoint Would Constitute Impermissible Viewpoint Discrimination In Violation Of The First Amendment Free Speech Clause.** ..................................................................................35

    A. The Supreme Court Has Consistently Held That Excluding Religious Speech Violates The First Amendment's Free Speech Clause Because It Constitutes Impermissible Content-Based Or Viewpoint Discrimination...............................................................36

    B. School Districts Seeking An Easy Way Out Suppress Speech; Then They Need Not Cope With The Misconception That Whatever Speech The School Permits, It Espouses.37

    C. The School District Created A Public Forum In At Least Two Ways, And The School District Cannot Now Exclude Participants Solely On The Basis Of Their Religious Viewpoints. .....................................................................................................................38

III. **The Public Interest Is Not Served By Rearranging Two High School Graduations At The Last Minute, Particularly When Graduations Will Not Be Held At Elmbrook Church Starting In 2010** ..............................................................................................40

Case 2:09-cv-00409-CNC   Filed 05/22/09   Page 11 of 45   Document 26

## ARGUMENT

A preliminary injunction is an extraordinary remedy that is only granted where there is a clear showing of need. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (preliminary injunction is an "extraordinary remedy" and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion"); *see also*, *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983). Five factors figure into the determination of whether a preliminary injunction should be granted. As a threshold matter, Plaintiffs must show 1) a reasonable likelihood of success on the merits, 2) irreparable harm if the preliminary injunction is denied, and 3) the inadequacy of any remedy at law. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). If Plaintiffs fail to prove any of these threshold elements, the inquiry is over and the injunction must be denied. *Roth v. Lutheran General Hospital*, 57 F.3d 1446, 1453 (7th Cir. 1995).

If this threshold showing is made, the Court must balance two additional factors: the harm to Plaintiffs if the preliminary injunction is wrongfully denied against the harm to Defendant if the injunction is wrongfully granted, and the impact on persons not directly concerned in the dispute, i.e. the "public interest." *Id.*; *see also*, *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). The Seventh Circuit has routinely applied these factors in cases involving alleged constitutional violations, and affirmed the denial of motions for preliminary injunctions. *See, e.g., Ping v. National Educ. Ass'n*, 870 F.2d 1369, 1371 (7th Cir. 1989); *Stewart v. Taylor*, 104 F.3d 965 (7th Cir. 1997).

Applying the above factors, this Court should deny Plaintiffs' motion for preliminary injunctive relief.

## I. HOLDING THE GRADUATION AT ELMBROOK CHURCH DOES NOT VIOLATE THE ESTABLISHMENT CLAUSE UNDER THE CIRCUMSTANCES.

Plaintiffs allege that holding graduation in a house of worship is "manifestly unconstitutional." But they acknowledge, as they must, that neither the Supreme Court nor any circuit court of appeals has held it so. In fact, the few courts that have decided the issue on the merits have found the practice to be constitutional. *Miller v. Cooper*, 244 P.2d 520 (N.M. 1952); *Lolo v. School Board of Charlotte County, Florida*, Case No. 89-250-Civ-FM-21B (M.D.Fla., October 18, 1991). *See also State ex rel Conway v. District Board of Joint School District No. 6*, 156 N.W. 477 (1916) (upholding the practice under the Wisconsin state constitution).

Below, we consider the various tests courts have applied to evaluate alleged violations of the Establishment Clause. In light of the appropriateness of the venue in comparison to other secular alternatives, holding graduation at Elmbrook Church satisfies each of these tests.

### A. Based On Neutral, Secular Criteria, Elmbrook Church Is The Most Appropriate Facility For Graduation Exercises.

Contrary to Plaintiffs' suggestion, Elmbrook Church is more than just a church with air conditioning and padded seats. The building is fully handicap-accessible, including ample handicap parking, modern elevators, equipped and conveniently located restrooms, and wheelchair seating available throughout the Auditorium. For students and families who are hearing impaired or visually impaired, the facility contains a modern audio, lighting, and video system. The Auditorium affords excellent sight lines to speakers and graduates from any location in the Auditorium, including the projection of images of speakers and graduates onto two large television screens. There are no "bad" seats. The seating capacity is appropriate: ample, but not so overwhelming so that the occasion fails to feel intimate. Outside the building, the grounds are nicely landscaped and well-maintained, providing the setting for photo opportunities for graduates and their families. Parking is free and abundant.

13

To truly understand what the above advantages mean in practice, consider the grandparents of graduates. Grandparents often have limited mobility and may require the assistance of a walker or use of a wheelchair. They find it more difficult to climb bleachers, and when they do, they may have difficulty descending. They need more frequent access to handicap-accessible restrooms. Their hearing and vision may be diminished. It is more challenging for them to negotiate traffic and parking in downtown Milwaukee. They most feel the effects of sitting for long periods on hard wooden bleachers in crowded, stifling hot conditions. And frequently, they are on a fixed income; free parking matters.

Before graduations were moved to Elmbrook Church, grandparents unable to negotiate bleachers were forced to sit at floor level. Besides obscuring a grandparent's sight lines, seating a grandparent at floor level frequently resulted in that grandparent being separated from the other family members, who were required to sit in the bleachers – or wherever they could find seating. Admirably, many grandparents would not allow the above limitations to prevent them from being present for a grandchild's graduation.

Moreover, attendance at the graduation exercises at Elmbrook Church over the last several years has been approximately 2,800 to 3,000 persons, which equates to approximately 8 persons per senior based on the number of seniors this year. There are only a handful of venues that can hold that number of persons, and none are within a reasonable distance of the schools and offer a reasonable rental price as compared to the Elmbrook Church venue. For example, Miller Park would have cost the School District in excess of $12,000. Certainly, Plaintiffs' apparent preference for the Waukesha County Exposition Center, which has capacity for 1,800 persons, is insufficient in size. Even assuming that facility were available, the District would need to issue tickets to its senior students limiting each student to 3 tickets, thus rendering

grandparents, extended family, other students and members of the public unable to attend the exercises. The District has no desire to render graduation akin to a wedding in a far-off destination where the guest list is necessarily limited.

Moreover, the facility use fee for Elmbrook Church – around $2,000 - is reasonable. The cost is roughly the same or less than the cost to hold the proceedings in the gymnasiums of the high schools. No other comparably-sized facility is anywhere near this cost. Likewise, Elmbrook Church is located 4.5 and 9.5 miles from each respective school. Alternative venues suggested by Plaintiffs (the U.S. Cellular Arena and Cooley Auditorium in downtown Milwaukee) would require the graduates and their families and invitees to drive to downtown Milwaukee, navigate traffic, and then likely pay to park.

The School District simply does not have a facility on District property to house this year's graduations. The two school's gymnasiums are under construction, one of which has a balcony already demolished and both of which are scheduled for further demolition next week. The 2009 exercises cannot possibly be held in a District facility.

In every respect, the Elmbrook Church facilities are ideal for the occasion.

**B. The "Touchstone" Of The Establishment Clause Is "Governmental Neutrality Between Religion And Religion, And Between Religion And Nonreligion."**

The "touchstone" of the Establishment Clause is "governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 860 (2005). Neutrality is "a significant factor in upholding governmental programs in the face of Establishment Clause attack." *Good News Club v. Milford Central School*, 533 U.S. 98, 114 (2001), citing *Rosenberger*, 515 U.S. at 839. In "distinguishing between indoctrination that is attributable to the State and indoctrination that is not, the Court has consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of

Case 2:09-cv-00409-CNC   Filed 05/22/09   Page 15 of 45   Document 26

groups or persons without regard to their religion." *Id*., citing *Mitchell v. Helms*, 530 U.S. 793, 809 (2000) (plurality opinion). *See also Mitchell* at 838 (O'Connor, J., concurring) ("[N]eutrality is an important reason for upholding government-aid programs against Establishment Clause challenges"). The "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id*., citing *Rosenberger*, 515 U.S. at 839.

This emphasis on neutrality imbues all of the Supreme Court's decisions and is the crucial backdrop to the issues before this Court. At each step in this matter, the School District has acted with neutrality toward both "religion and nonreligion" consistent with "neutral criteria and evenhanded policies."

## C.     Holding Graduation At Elmbrook Church Satisfies The *Lemon* Test.

The Supreme Court has developed a three-prong test to determine whether government conduct establishes a religion in violation of this clause. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105 (1971). Permitting the School District to hold graduation in the Elmbrook Church pursuant to a neutral site selection process and based on neutral, secular criteria does not violate the *Lemon* test.

Despite "persistent criticism from several of the Justices, *Lemon* has not been overruled, and we are compelled to follow the approach it established." *Books v. Elkhart County, Ind.*, 401 F.3d 857, 862-63 (7th Cir. 2005). Under the "*Lemon*" test, conduct does not violate the Establishment Clause if: (1) it has a secular purpose; (2) it has a primary secular effect; and (3) it does not create excessive entanglement between government and religion. *Lemon* at 2111. Importantly, not all entanglements between government and religion have the effect of advancing religion because interaction between church and state is inevitable. *Agostini v. Felton*,

521 U.S. 203, 232 (1997). Entanglement must be "excessive" before it runs afoul of the Establishment Clause. *Id.*

> ### 1. No excessive entanglement results from the School District's arm's length, short-term, lease with Elmbrook Church.

Plaintiffs do not and cannot seriously contend holding graduations at Elmbrook Church has anything other than a *primarily* secular purpose or effect.[3] However, Plaintiffs argue that holding the graduation at a church results in "excessive entanglement." Specifically, Plaintiffs argue that excessive entanglement exists either 1) because the School District has given Elmbrook Church authority to control the physical setting for a public school event, or 2) because the School District would be exercising improper control over the Church's physical space. (*See* Pl. Br. at 20.)

If this argument had any merit, courts would routinely invalidate any lease between the government and religious entities because lessees and lessors routinely negotiate terms of use with respect to authority to control physical space being leased. Anytime a tenant leases space from a landlord in an arm's length transaction, negotiation may ensue about what changes a tenant may or may not make to a premises or what unique modifications a prospective tenant might require for particular occasions. A tenant may request to paint walls or plant flowers, but the landlord may say no. If the parties are unable to reach an agreement regarding terms of use, then the parties may walk away. This is particularly true when the lease at issue is a short-term, one-day lease, like the one in this case.[4]

---

[3] We address Plaintiffs' endorsement arguments separately in Section I.E of this Brief.

[4] Plaintiffs express concern that treating the Elmbrook Church Auditorium "as just another public space" would be an affront to Elmbrook Church, *see* Pl. Br. at 6, or constitute an "unhallowed perversion" by a district official, *see* Pl. Br. at 21. For its part, the School District does not presume to undertake any such determination on behalf of Elmbrook Church, and

Case 2:09-cv-00409-CNC    Filed 05/22/09    Page 17 of 45    Document 26

In fact, numerous leases between the government and religious entities have been upheld when they are arm's length transactions, negotiated as between any landlord and tenant or lessee and lessor. *See, e.g.*, *Porta v. Klagholz*, 19 F. Supp. 2d 290 (D.N.J. 1998) (upholding school district's lease of religious facility, finding entanglement "no different from the normal interface between landlord and tenant in leased space; money is paid for services received subject conditions of use articulated in the lease and the course of conduct"); *Thomas v. Schmidt*, 397 F. Supp 203 (1975) (concluding that a school district's lease of parochial school classrooms did not result in excessive entanglement because government intrusion into the affairs of the school was unlikely); *School District of Hartington v. Nebraska State Board of Education*, 195 N.W.2d 161 (Neb. 1972), cert. denied 409 U.S. 921 (1972) (finding no excessive entanglement in school district's lease of classroom in parochial school for public special education classes). *See also Taetle v. Atlanta Independent School System*, 625 S.E.2d 1770 (Ga. 2006) (arm's length commercial lease of church space by public school does not violate establishment clause of the Georgia state constitution).

One court reached a different conclusion regarding a public school's use of Catholic school classrooms for daily elementary school classes. *See Spacco v. Bridgewater*, 722 F. Supp. 834 (1989). However, the lease in that case contained a clause requiring that the school district's use of the premises

> shall be at all times consistent with the teachings of the Roman Catholic Church enunciated by the Holy Father and Bishops in communion with him… In this regard the parties hereto shall rely upon and defer to the teaching authority of the Roman Catholic Archbishop of Boston.

---

assumes that if such conduct is an affront to Elmbrook Church, the Church will not lease its facilities to members of the public.

*Id*. at 836. On the basis of this provision, the court distinguished the facts of *Spacco* from other lease cases, including *Thomas* and *School District of Hartington*, *supra*, because "none of those cases involved situations in which the religious institution involved had the power to influence the public school curriculum." *Id*. at 843, n.1. The provision in the lease provided the school district with "a powerful motive to avoid teaching anything," such as abortion, "which might threaten its continued use of the premises." *Id*. at 845. The First Amendment "does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." *Id*. Accordingly, the *Spacco* court found excessive entanglement. *Id*. at 845-46.

The concerns present in *Spacco* are not present here. Graduates of Brookfield East and Brookfield Central and their parents are not "impressionable youngsters." *See id.* at 843, n.1. But more importantly, no lease provision gives Elmbrook Church the power to influence the content of the graduation proceedings, much less daily public school curriculum. The lease is not a long-term lease that the school district relies upon for daily teaching functions, nor does the lease allow Elmbrook Church to terminate the lease on short notice upon the church's sole determination that the school district somehow defied church teachings. *See id.* at 845. In short, *Spacco* is inapplicable here. The lease between Elmbrook Church and the School District is an arm's length, short-term, landlord-tenant transaction resulting in minimal entanglement, and it does not run afoul of the *Lemon* test.

>    2.    **To The Extent That Use Of Elmbrook Church Causes Religious Divisiveness, Excluding An Otherwise Appropriate Venue Purely Because Of Its Religious Views Would Foster Greater Divisiveness.**

Plaintiffs also argue that excessive entanglement results because of the potential for religious divisiveness, citing complaints the District has received. This argument fails for two reasons. First, as a practical matter, divisiveness "can attend any state decision respecting

religions." *Lee*, 505 U.S. at 588. Yet government cannot avoid making decisions: fire and police protection is either extended to religious organizations or it is not; public school buses either service religious schools or they do not; religious organizations either pay taxes or they do not; and religious facilities may either be considered as potential venues for government functions pursuant to neutral criteria, or they may not. Advocates on both sides of these issues have strong opinions, but government must nonetheless make the decision.

Second, excluding Elmbrook Church purely on the basis of its religious views would undoubtedly result in *more* divisiveness. *See Good News* at 100 (noting the danger that students and the public would perceive a hostility toward the religious viewpoint if a religious organization was excluded from equal access to school facilities). In reality, complaints on this issue have been minimal.[5] More to the point, Plaintiffs do not merely suggest that Elmbrook Church should be excluded because it is a house of worship; Plaintiffs clearly find the *particular viewpoints* of the Church offensive, such as the Church's views on homosexuality and the Church's teaching that non-believers will go to hell. The potential for divisiveness increases exponentially when the government is asked to analyze the *particular views* of a religious organization before deciding whether to include the organization in a government program. *See also Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 395 (1993) (remarking that worries about "public unrest" caused by "proselytizing" are "difficult to defend as a reason to deny the presentation of a religious point of view"); *Lynch v. Donnelly*,

---

[5] Nearly all of the complaints came from the anti-religious organization Freedom From Religion Foundation or the organization directing this litigation, Americans United for Separation of Church and State. In the eight or so years that graduations have been held at Elmbrook Church, very few parents or students have complained to the District about the practice.

465 U.S. 668, 684-685 (1984) (holding that "political divisiveness" could not invalidate inclusion of crèche in municipal Christmas display).

In sum, the potential for divisiveness cannot justify excluding Elmbrook Church from consideration based on neutral, secular criteria. Because any entanglement is not "excessive," the School District satisfies the *Lemon* Test.

### D. The Graduation Proceeding Itself Is Undisputedly Secular, And Therefore No Person Has Been Coerced To Participate In Any "Religious Exercise" Or "Formal Religious Observance."

#### 1. The cases Plaintiffs cite in support of their coercion argument all involve instances of coerced group prayer, which is not present here.

Plaintiffs also argue that holding graduation at Elmbrook Church constitutes coercion. In so arguing, Plaintiffs hope this Court will not notice that the graduation proceeding itself is purely, undisputedly, secular. Indeed, nearly all of the cases Plaintiffs cite in support of their coercion argument involve instances of coerced participation *in group prayer*. (*See* Pl. Br. at 3-5, citing *Lee v. Weisman*, 505 U.S. 577, 587 (1992); *Sch. Dist. v. Schempp*, 374 U.S. 203, 224-26 (1963); *Engel v. Vitale*, 370 U.S. 421, 4314 (1962); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310-12 (2000); *Mellen v. Bunting*, 327 F.3d 355, 371-72 (4th Cir. 2003).)

The only coercion case remotely resembling the current case is *Lee v. Weisman*, in which the Supreme Court struck down the practice of school-sponsored prayer at graduation. In *Lee*, the principal decided that an invocation and a benediction should be given, chose the religious participant to deliver the same, and directed and controlled the content of the prayers. *Id*. at 587-88. In effect, the school district "compose[d] official prayers for [a] group of the American people to recite as a part of a religious program carried on by government." *Id*. at 588. In light of those facts, the Court concluded:

The government involvement with religion was so pervasive, the point of creating a *state-sponsored and state-directed religious exercise* in a public school. Conducting this *formal religious observance* conflicts with settled rules pertaining to *prayer* exercises for students, and that suffices to determine the question before us.

*Id.* at 587 (emphasis added). Thus, *Lee*'s holding is limited to cases involving state-directed, "formal religious exercise" – i.e. coerced group prayer. *See id.* at 589.

Let us be clear: this is not such a case. No one leads the graduates and their families in any invocation, benediction, prayer, moment of silence, or other religious observance whatsoever. No person has been forced to kneel, stand, or remain silent during the giving of any prayer. Plaintiffs may argue that the very act of being forced to stand respectfully in the presence of religious iconography is coerced participation in a religious exercise. To be sure, graduates and guests are expected to conduct themselves in a manner befitting the occasion of graduation. However, the School District does not direct guests to behave in any manner other than if graduation were held anywhere else: in other words, clap for the student speakers even if they bore you, refrain from putting gum under your seat, and take your garbage with you when you leave. No graduate or guest is forced to act in any particular way toward Elmbrook Church itself or any visible religious symbols or artifacts. In this case, there simply is no "religious exercise" or "formal religious observance" – i.e. coerced group prayer.

In *State ex rel Conway v. District Board of Joint School District No. 6*, the Wisconsin Supreme Court upheld the practice of holding public school graduation exercises in a church. 156 N.W. 477, 480 (1916). The court considered the issue in the context of the "compelled worship" clause of the Wisconsin State Constitution, but the court's reasoning is useful here. *See id.* The court concluded that it is the substance of the exercises, not the facility, that determines whether a participant has been impermissibly "compelled" to worship:

Parents and pupils of all denominations have a right to attend such exercises without their legal rights being invaded. It would be farfetched, however, to say that by so doing they are compelled to attend a place of worship….The kind of a building is hardly the significant thing from the legal standpoint, but the fact that worship is carried on when there is actual or moral compulsion. …

[The compelled worship clause] protects a man from being obliged to attend the services of the Salvation Army in our public streets, or from being compelled to enter a hall or opera house which such services are being carried on, just as much as it does against being forced to enter a church. It is what is done, not the name of the place where it is done, that is significant.

*Id*. at 480.

Under with *Lee*, the District does not dispute that attendance at graduation is essentially involuntary, even though graduates are not compelled to attend graduation in order to receive their diplomas. However, *Lee* and other coerced group prayer cases are inapposite in light of the purely secular nature of the graduation proceeding itself.

> **2.** **The two district court level cases that Plaintiffs cite lack any application of current law to facts and contain no discussion of coercion.**

Plaintiffs also cite two district court level cases, *Musgrove v. Brevard County School Board*, 2005 WL 6269441 (M.D.Fla. 2005), and *Lemke v. Black*, 376 F. Supp. 87 (E.D. Wis. 1974). Neither opinion represents a final decision on the merits, but merely on the issue of preliminary injunction. Plaintiffs' reliance on those cases is problematic for several reasons.

The Florida district court decision in *Musgrove* is actually a transcript of an oral decision from the bench. *Musgrove*, 2005 WL 6269441 at * 1. The judge rendering the oral decision was not the judge assigned to the case. *Id*. The decision contains no discussion of the appearance of the church, the commencement exercise itself, or the neutral merits of other secular alternatives. In fact, the decision cites no case law whatsoever, and the transcript devotes only one paragraph to a discussion of the likelihood of success on the merits. *Id*. The cursory treatment of the issue is likely explained by the fact that the hearing took place 24 hours before the scheduled

23

graduation.  *Id*. at * 2.  It is unclear whether the court even had time to review the parties' briefings prior to the oral ruling.  In sum, *Musgrove* provides no meaningful application of law to the facts that can be compared and contrasted with this case.  *Musgrove* has nothing useful to say on the merits, and certainly not with respect to coercion

*Lemke* is similarly unhelpful.  As a 1974 decision, *Lemke* does not employ any existing Establishment Clause framework and instead rests entirely on the political divisiveness analysis, which has been debunked or limited in multiple decisions since.  Like *Musgrove*, the *Lemke* decision contains no details regarding the appearance of the church, the commencement exercise itself, or available secular alternatives.  At most, *Lemke* establishes that attendance at graduation is not voluntary, which the School District readily admits.  In short, *Lemke* is outdated and offers no insights on the issue of coercion.[6]

> **3.    Because this case bears no resemblance to the contexts in which courts have found coercion, Plaintiffs coercion argument fails.**

Because this case bears no resemblance to the coerced group prayer cases that Plaintiffs cite in their Brief, Plaintiffs' coercion argument fails.  Nor is this a case like any of the other cases cited by Plaintiffs in which courts have recognized coercion: *See Venters v. City of Delphi*, 123 F.3d 956, 969-70 (7th Cir. 1997) (supervisor violated coercion test by pressuring, and later threatening, government employee to adopt and conform her conduct to his religious beliefs);

---

[6] A far more comprehensive and thoughtful written decision is the summary judgment decision in *Lolo v. School Board of Charlotte County, Florida*, Case No. 89-250-Civ-FM-21B (M.D.Fla., October 18, 1991).  In a detailed discussion of the law and comparison of available secular alternatives, a federal district court found that holding graduation in the church facility did not violate the Establishment Clause.  That decision is not available on Westlaw, and the case file for *Lolo* has been transferred from the United States District Court for the Middle District of Florida to the National Archives in Atlanta, Georgia.  Because of the time constraints in this case, counsel for the School District has not yet been able to obtain a "clean" copy of the decision. While our copy is difficult to read, we attach it for the Court's information as Exhibit A to the Affidavit of Lori M. Lubinsky.  We also discuss the case in greater detail below in Section I.E regarding endorsement.

*Kerr v. Farrey*, 95 F.3d 472, 476-80 (7th Cir. 1996) (prison violated coercion test by requiring prisoner to attend religious program or face higher security-risk classification and delayed parole eligibility); *Milwaukee Depty Sheriffs Ass'n v. Clarke*, 513 F. Supp. 2d 1014, 1022 (E.D. Wis. 2007) (county sheriff coercively promoted religion by inviting group from Elmbrook Church to give proselytizing presentations at mandatory meetings of deputy sheriffs).

The remaining cases Plaintiffs cite in support of their coercion argument are more properly considered symbolic endorsement cases.[7] None of those cases found "coercion" merely from the fact of unwanted exposure to religious symbols. If mere unwanted exposure to religious symbolism is sufficient to constitute coercion, then a student is coerced anytime a teacher assigns a reading or shows a film in class about world religions. This defies common sense and established First Amendment jurisprudence. The proper inquiry in those situations is whether the teacher is "endorsing" a religious viewpoint, not whether the student is "coerced" into participating in a religious observance. Endorsement cases are discussed below.

E.    **No Reasonable Observer Would Conclude The School District Is Endorsing The Views Of Elmbrook Church By Holding Graduations At Elmbrook Church In June of 2009.**

In light of the history and circumstances surrounding the School District's graduations, especially in light of the referendum, remodeling and construction of a new field house, no reasonable observer would conclude that the School District is endorsing the views of Elmbrook Church by holding the schools' graduation exercises at the Church.

_____

[7] *See* Pl. Br. at 11-12, citing *Spacco v. Bridgewater School Department*, 722 F. Supp. 834, 842-43 (D. Mass. 1989); *Porta v. Klagholz*, 19 F. Supp. 2d 290, 303 (D.N.J. 1998); *Thomas v. Schmidt*, 397 F. Supp. 203, 207, 212 (D.R.I. 1975); *State ex rel Sch. Dist. of Hartington v. Neb. State Bd. of Educ.*, 195 N.W.2d 161, 162, 168 (Neb. 1972); *Walker v. S.F. Unified Sch. Dist.*, 46 F.3d 1449, 1456 (9th Cir. 1995); *Pulido v. Cavazos*, 934 F.2d 912, 919-20 (8th Cir. 1991); *Comm. for Pub. Edu. & Religious Liberty v. Sec'y, US. Dep't of Educ.*, 942 F. Supp. 842, 863-64 (E.D. N.Y. 1996).

1. **The "touchstone" of the Establishment Clause is neutrality between religion and religion, and between religion and nonreligion, and the risk of perceived endorsement is viewed from the point of view of a reasonable, objective observer.**

The "touchstone" of the Establishment Clause is "the principle that the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Vision Church v. Village of Long Grove*, 468 F.3d 975, 992 (7th Cir. 2006) (quoting *McCreary Co.*, 545 U.S. at 860). Government violates this principle when, "irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Id*. at 993 (internal citations omitted.)

Not "every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not… show a violation." *Lee*, 505 U.S. at 597. As the Supreme Court has acknowledged, "sometimes to endure social isolation or even anger may be the price of conscience or nonconformity." *Id*. at 597-98. Accordingly, the Establishment Clause does not require that the government censor religious expression merely because of the possibility that someone may be offended or may misperceive endorsement.

Rather, the question is whether "a reasonable person, apprised of the circumstances" surrounding the government conduct, would conclude that the conduct "amounted to an endorsement of religion." Id. at 993. The risk of perceived endorsement is to be judged on the basis of "an objective observer," not any particular individual or group. *Mergens*, 496 U.S. at 249 (plurality).

2.    **In the only three decisions to dispose of the issue on the merits, courts found no establishment clause violation, recognizing the secular problems solved by the religious facility.**

Religious organizations can play an "important part" in resolving secular problems. *Bowen v. Kendrick*, 487 U.S. 589, 607 (1988). The Elmbrook Church's facility resolves numerous secular problems and is the most appropriate venue under the circumstances.

In the only three decisions to dispose of the issue on the merits, courts found no Establishment Clause violation when public school graduations were held in churches. *Lolo*, Case No. 89-250-Civ-FM-21B; *Miller*, 244 P.2d 520; *State ex rel Conway*, 156 N.W. 477. In each case, the courts acknowledged the secular problems that the challenged venue resolved. For example, the *Miller* court concluded:

> These functions are of great interest to the pupils and their relatives, and like other communities throughout the state the churches are the only buildings which could comfortably accommodate those present. We are firmly committed to the doctrine of separation of Church and State, both by our constitutional provisions and statutes…but we do not feel they require us to prohibit the holding of these time honored programs in a building where all who desire to attend may be accommodated.

*Miller* at 521.

Considering the issue in the context of the "compelled worship" clause of Wisconsin's constitution, the Wisconsin Supreme Court likewise noted:

> Graduation exercises take place but once a year. Often in smaller places church auditoriums are more commodious and better calculated to take care of the overflow crowds that congregate at such times than any other building that is available. To say that a person attending such place once a year is compelled to attend a place of worship would be giving prominence to form rather than to substance.

*State ex rel Conway* at 480.

The summary judgment decision in *Lolo* contains a thoughtful comparison of secular alternatives. The court considered numerous factors, including distance, availability, seating

quantity and configuration, wheelchair accessibility, and visibility, to conclude that a United Methodist Church was the most reasonable venue. Plaintiffs point to *Musgrove*, 2005 WL 6269441, and *Lemke*, 376 F. Supp. 87, in which courts granted preliminary injunctions in cases involving graduations in churches. As discussed *supra*, however, those decisions contain little or no meaningful application of law to fact, and therefore provide little guidance to this Court. Those courts did not address the appearance of the church, the commencement exercise itself, or available secular alternatives. Like the *State ex rel Conway*, *Miller*, and *Lolo* courts concluded, the School District here has selected the most appropriate venue based on secular criteria.

> ### 3. The history and context of the practice of holding graduation at Elmbrook Church make clear that the School District selected the most appropriate venue based on neutral, secular criteria.

Importantly, the reasonable, objective observer is "deemed aware" of the "history and context" underlying the challenged practice. *Zelman v. Simmons-Harris*, 536 U.S. 639, 655 (2002). Plaintiffs make much of the fact that one or more School District employees or officials are members of Elmbrook Church. Undoubtedly, Elmbrook Church has a large membership. A smaller congregation would not have the large, modern facilities necessary to accommodate a crowd of 3000 or more. . In addition, the Church is less than 5 miles away from one of the high schools and less than 10 miles away from the other. Accordingly, the fact that one administrator and one Board member are members would not surprise anyone in the community.

A reasonable observer familiar with the history and context of the District's practice of holding graduation exercises at Elmbrook Church is aware of the numerous secular advantages that Elmbrook Church has over any other alternative, and the reasonable cost compared to other venues. The District's community is well aware of the attributes, advantages and disadvantages that have been considered in past years. In addition, a reasonable observer familiar with the

history of the practice will know that the idea to consider venues beyond the high school gymnasiums did not originate with school administrators, but with students. Prior to 2000, graduations for both high schools were held in the high schools' respective gymnasiums. In 1999, after several hot, crowded graduations, senior class officers for Brookfield Central inquired about the use of the Elmbrook Church auditorium. Class officers then considered several other locations. Graduating seniors narrowed the choices down to two or three choices, and voted. Each year that this process was followed, graduating seniors overwhelmingly voted to hold the graduation at Elmbrook Church. School principals approved the final decision based on the student vote and based on the clear advantages of the venue over other alternative venues. Brookfield East followed Brookfield Central's example in 2002 and began holding its graduations at Elmbrook Church.

A reasonable observer aware of the history of the practice will also know that Elmbrook Church became a popular venue for graduation not just in the Elmbrook School District, but among other districts. Thus, in later years, high school staff sometimes needed to reserve Elmbrook Church up to a year in advance because of competition from other area high schools. In those years, the administrators met with senior class officers in the fall to discuss the venue. In each year, graduating seniors or their class officers considered the secular alternatives and requested Elmbrook Church.

Plaintiffs claim that District leaders could not be truly objective in assessing complaints about the religious venue. "Very likely," Plaintiffs claim, "if the graduations had been held in a mosque replete with Islamic symbols," "the District's leaders would have moved the graduations long ago." (Pl. Br. at 18-19.) To the contrary and more likely, if senior class officers persisted in their request to explore alternatives to the hot, stuffy gym, and if graduating seniors concluded

that a local mosque constituted the most appropriate, cost-effective alternative, the School District's leaders would have approved it, consistent with the advice of their legal counsel. There is no evidence whatsoever that any administrator allowed his or her personal religious views to influence the site selection process. The history and context of the site selection process make clear that Elmbrook Church was chosen in response to secular needs and pursuant to a neutral selection process.

### 4. The advisory student votes were constitutional.

Citing *Santa Fe Independent School District v. Doe*, Plaintiffs claim that the student votes with respect to the graduation site were a separate constitutional violation. See 530 U.S. 290 (2000). This issue is irrelevant for purposes of Plaintiffs' injunction motion as no student vote was cast this school year which resulted in the current chosen forum for the 2009 graduations. Even if relevant, however, *Santa Fe* and is inapposite here for the same reason that *Lee* and its progeny do not apply: no prayer, invocation, or other formal religious exercise is at issue here.

In *Santa Fe*, a district policy specifically authorized two student elections, the first to determine whether "invocations" should be delivered at school-sponsored football games, and the second to "select the spokesperson to deliver them." Id. at 297. The "invocation" was "broadcast over the school's public address system, which remains subject to the control of school officials." Id. at 307. In striking down the "invocation" policy, the Court refused to "to pretend that we do not recognize what every Santa Fe High School student understands clearly – that this policy is about prayer." Id. at 315. When participating in the election, "students understood that the central question before them was whether prayer should be a part of the pregame ceremony." Id. at 307. Key to the Court's holding was "the evolution of the current policy." Id. at 309. The policy had gone through several iterations, from the "long-sanctioned

office of 'Student Chaplain' to the candidly titled 'Prayer at Football Games' regulation," all designed to ensure that the practice of prayer was preserved.  Id. at 309.

In *Santa Fe*, along with all of the other cases Plaintiffs cite in support of this argument, the sole issues put to student vote were whether to have prayer at graduation and who would lead it. (See Pl. Br. at 19-20, ff. 11.)  That is not the case here.

Brookfield Central and Brookfield East students did not vote on whether prayer or other religious exercise was to be part of graduation.  There is no history of a "Student Chaplain" or a "Prayer at Graduation" policy.  There is no longstanding history of holding graduation in a religious facility that the School District sought to continue by holding a "sham" election.  *See id.* at 308.  When students first approached their Principal and then the School District administration to suggest alternatives to the high school gymnasium, the School District had to fashion a fair way to consider available alternatives and make a decision.  The process that resulted was one in which multiple venues were explored.  Unsuitable alternatives were weeded out, and students then voted.  The student vote was advisory.  Principals at each school then approved the students' choice of venue.  Because students at Brookfield East and Brookfield Central voted on a facility, not a prayer or religious observance, the student advisory votes were proper.

> **5.    Graduates and their families are mature enough to understand that that the religious expressions at Elmbrook Church belong to the Church, not the School District administration.**

Schools simply "do not endorse everything they fail to censor."  *Mergens*, 496 U.S. at 250 (plurality).

In support of their endorsement argument, Plaintiffs rely on *McCreary County v. ACLU of Ky.*, 545 U.S. 844 (2005); *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989); *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766 (7th Cir. 2001);

31

and *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir. 1987). However, the central issue in each of those cases was the placement of a prominent religious display *on government-owned property*, where reasonable people normally presume the government to "own" the message. In this case, the religious symbols are located on private property. The School District is unmistakably borrowing a *private facility* for a secular purpose. Any reasonable person who attends the graduation for either school knows as much.

A primary concern of Plaintiffs' is the presence of religious symbols in photographs or videos memorializing the occasion. However, the School District pays for a professional videographer to record commencement exercises each year for each high school. The recording is then broadcast on Brookfield's local cable channel. No religious iconography or artifacts appear in those videos, except for the bottom portion of the cross, which is minimally visible and only in the opening processional. No other religious symbols, icons, texts, or other evidence of the religious nature of the venue are visible in the remainder of the recordings.

Similarly, the School District provides a professional photographer to capture the moment when each graduate receives his or her diploma. Those pictures are available for purchase by graduates and their families. In keeping with the focus of the event, no religious symbols whatsoever are visible in those pictures.

Moreover, in contrast to cases like *McCreary* and *Allegheny*, the religious symbols are not the central focus of the commencement exercise. To claim otherwise is to ignore the processional and recessional, student and administrator speeches, band or orchestra music, choir, issuance of the diplomas, images of smiling graduates displayed on the jumbotrons, and the printed graduation programs that guests hold in their hands. This is a graduation, not a worship service, and everyone in attendance knows that.

Finally, the graduation exercise here is once per year and lasts less than two hours. That is a far cry from the year-round religious display in *McCreary* or the seasonal crèche display in *Allegheny*, *O'Bannon*, and *American Jewish Congress*. The circumstances of this case are an even further cry from *Spacco*, in which a court found endorsement involving a lease of a Catholic school based on the exposure to religious displays. *See Spacco*, 722 F. Supp at 842. In that case, "impressionable, young children" played daily on a playground under prominent Catholic symbols, took daily walks through a Catholic cemetery, received religious announcements, and interacted regularly with parish priests and nuns in Catholic garb. *Id*. In contrast, the exposure in this case is a single occasion of short duration in which all are there for only one reason: to celebrate the students' completion of secondary education.

Under these circumstances, graduates and families of Brookfield East and Brookfield Central are no doubt capable of understanding that the religious expressions at Elmbrook Church belong to the Church, not the school administration. As the Supreme Court noted in *Mergens*:

> [T]here is a crucial difference between *government speech* endorsing religion, which the Establishment Clause forbids, and *private speech* endorsing religion, which the Free Speech and Free Exercise Clauses protect. We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support…speech that it merely permits on a nondiscriminatory basis.

496 U.S. at 250, 110 S.Ct. 2356 (plurality) (emphasis in original). Like the high school students in *Mergens*, the young men and women of Brookfield East and Brookfield Central are mature enough to understand that Elmbrook Church's views are Elmbrook Church's views. No reasonable observer, familiar with the history and context of the practice, would conclude that the School District endorses or adopts the Church's views merely because the District fails to censor the Church's religious expressions during a once-per-year commencement proceeding.

**F.**   **The School District Does Not Violate The Establishment Clause By Paying Market-Rate Facility Use Fees For The Provision Of Secular Services.**

Plaintiffs accuse the School District of "using tax funds to support the propagation of religion."  (Pl. Br. At 22.)   As a preliminary matter, Plaintiffs lack standing as taxpayers to challenge the School District's use of taxes to pay facility use fees for graduation.  *See Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587, (2007); *Freedom From Religion Foundation v. Nicholson*, 536 F.3d 730 (7th Cir. 2008); *Hinrichs v. Speaker of the House of Representatives of the Indiana General Assembly*, 506 F.3d 584 (7th Cir. 2007).  As those cases make clear, taxpayers lack standing to challenge expenditures on Establishment Clause grounds unless the violating expenditure is expressly authorized or mandated by a specific legislative or congressional enactment, rather than a purely discretionary use of those funds by an executive agency.  The School District's expenditure of property taxes to defray graduation expenses is certainly a discretionary expenditure, not authorized by a specific legislative enactment, and therefore Plaintiffs lack standing to challenge the expenditure.

Article III standing aside, Plaintiffs' tax-based argument fails on the merits.  "Whatever its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected."  *Hunt v. McNair*, 413 U.S. 734, 743 (1973).  *See also Rosenberger*, 515 U.S. at 819 (declaring unconstitutional a state university's refusal to extend neutrally-available funds to a Christian group); *Mitchell*, 530 U.S. 793 (overruling earlier decisions precluding aid to parochial schools); *Walz v. Tax Comm'n*, 397 U.S. 664 (1970) (upholding state law that provides property tax exemptions for property use exclusively for religious purposes); *Bowen*, 487 U.S. 589 (upholding federal program that provided grants to religious organizations that provide counseling to prevent adolescent sexual activity); *Zobrest v. Catalina Foothills School District*,

509 U.S. 1 (1993) (upholding government program providing sign language interpreters for parochial school students); *Porta*, 19 F. Supp. 2d 290 (upholding school district's lease of religious facility); *Thomas*, 397 F. Supp 203 (same); *School District of Hartington*, 195 N.W.2d 161, cert. denied 409 U.S. 921 (same); *Taetle v. Atlanta Independent School System*, 625 S.E.2d 1770 (same conclusion under establishment clause of the Georgia state constitution).

In this case, the School District will spend approximately $2,000 per school to hold the graduation exercises at the Elmbrook Church. At least as much, if not more, would be spent by the School District if the exercises were held on District property, even a facility was available. In short, the small amount the School District spends to rent a facility for graduation exercises does not violate the Establishment Clause.

II.  **EXCLUDING ELMBROOK CHURCH SOLELY ON THE BASIS OF ITS RELIGIOUS VIEWPOINT WOULD CONSTITUTE IMPERMISSIBLE VIEWPOINT DISCRIMINATION IN VIOLATION OF THE FIRST AMENDMENT FREE SPEECH CLAUSE.**

Clearly, Plaintiffs find the teachings of Elmbrook Church offensive. However, "[t]here is a crucial difference between *government speech* endorsing religion, which the Establishment Clause forbids, and *private speech* endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Mergens*, 496 U.S. at 250 (plurality) (emphasis in original). In this case, Plaintiffs ask the School District to exclude an otherwise appropriate venue from consideration purely on the basis of that venue's organizer's religious views, or worse, to silence the Elmbrook Church's private speech because some may find the Church's views offensive. To do either would constitute impermissible viewpoint discrimination in violation of the First Amendment's Free Speech Clause.

**A.** **The Supreme Court Has Consistently Held That Excluding Religious Speech Violates The First Amendment's Free Speech Clause Because It Constitutes Impermissible Content-Based Or Viewpoint Discrimination.**

In recent years, a significant number of cases have concerned situations where the government chooses to restrict private religious speech because of a desire to avoid violating the Establishment Clause. The Supreme Court, however, has consistently held that excluding religious speech violates the First Amendment's Free Speech clause because it constitutes impermissible content-based or viewpoint discrimination. *See, e.g., Good News Club*, 533 U.S. 98 (holding that elementary school cannot exclude a religious group from using school facilities after school); *Lamb's Chapel*, 508 U.S. 384 (striking down policy of excluding religious groups during evenings and weekends); *Mergens*, 496 U.S. 226 (holding that school may not deny equal access to students for purposes of religious speech); *Widmar v. Vincent*, 454 U.S. 263 (1981) (declaring unconstitutional a policy of preventing student groups from using school facilities for religious worship or religious discussion).

Importantly, the Supreme Court has never held that the government's interest in avoiding an Establishment Clause violation is sufficient to justify viewpoint discrimination. *See Good News Club* at 111-12. Initial Supreme Court cases in this area concerned efforts by the government to deny religious groups from neutral access government facilities so as to avoid violating the Establishment Clause. However, free speech protections are triggered even when government uses private property for government purposes. *See, e.g.*, *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.,* 308 F.3d 1114, 1131 (10th Cir. 2002) (applying free speech analysis to city's easement over private property); *Nurre v. Whitehead*, 520 F. Supp. 1222, 1229-30 (W.D. Wash. 2007) (applying free speech analysis when school district allowed graduating students to choose music for graduation exercise held off-campus).

36

Free speech analysis also applies when the government makes funds generally available pursuant to neutral, secular criteria. For example, in *Rosenberger v. Rector and Visitors of the University of Virginia*, the Supreme Court held unconstitutional a university's refusal to extend neutrally-available student activity funds to a Christian group. 515 U.S. at 831. The Court noted that although the government has wide discretion when it chooses to allocate scarce financial resources, "[i]t does not follow…that viewpoint-based restrictions are proper." Id. at 834. The "first danger to liberty lies in granting the State the power to examine publications to determine whether or not they are based on some ultimate idea and if so for the State to classify them. The second, and corollary, danger is to speech from the chilling of individual thought and expression." Id. at 835. Emphasizing the neutrality of the government program, the Court concluded that providing funds to the religious group would not violate the Establishment Clause. Id. at 840. Finally, the Court found "no difference in logic or principle, and no difference of constitutional significance, between a school using its funds to operate a facility to which students have access, and a school paying a third-party contractor to operate the facility on its behalf." Id. at 843.

B.    **School Districts Seeking An Easy Way Out Suppress Speech; Then They Need Not Cope With The Misconception That Whatever Speech The School Permits, It Espouses.**

In balancing Free Speech and Establishment Clause interests, the Seventh Circuit has observed, "School districts seeking an easy way out try to suppress private speech. Then they need not cope with the misconception that whatever speech the school permits, it espouses." *Hedges v. Wauconda Community Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1299 (7th Cir. 1993). Yet schools cannot simply abandon neutrality because of fear of litigation:

> Wauconda proposes to throw up its hands, declaring that because misconceptions are possible it may silence its pupils, that the best defense against misunderstanding is censorship. What a lesson Wauconda proposes to teach its students!

Id. The "proper response," the 7th Circuit opined, "is to educate the audience rather than squelch the speaker:"

> Far better to teach them about the First Amendment, about the difference between private and public action, about why we tolerate divergent views. Public belief that the government is partial does not permit the government to become partial.
> …
> Just as bellicose bystanders cannot authorize the government to silence a speaker, so ignorant bystanders cannot make censorship legitimate. Schools may explain that they do not endorse speech by permitting it. If pupils do not comprehend so simple a lesson, then one wonders whether the Wauconda schools can teach anything at all. Free speech, free exercise, and the ban on establishment are quite compatible when the government remains neutral and educates the public about the reasons.

Id. at 1299-1300.

**C.** **The School District Created A Public Forum In At Least Two Ways, And The School District Cannot Now Exclude Participants Solely On The Basis Of Their Religious Viewpoints.**

Make no mistake: this case is about viewpoint. Plaintiffs object not just to the fact that Elmbrook Church is a religious facility, but to the "entirely unwanted recognition of… the authority of a religious viewpoint contrary to their own." (Pl. Br. at 6.) According to Plaintiffs, those symbols and materials in the Church represent the Church's views that atheists will go to hell and that homosexuality is wrong. Because the *views* of Elmbrook Church are contrary to those of the District or some of its students and parents, Plaintiffs assert, the District must exclude the organization.

38

In this case, the School District has created a public forum in at least two ways.[8] First, as in *Rosenberger*, the School District designated funds for a particular purpose and made them available to an organization that met certain neutral, secular criteria. The School District cannot now deny funds to a group that otherwise meets the criteria solely on the basis of the religious views of the group. Second, the School District invites graduates, families, and interested members of the community to attend graduation proceedings for purposes of celebrating the occasion. Just as individual parents and graduates may wear crosses or otherwise express their religious views, so may the Elmbrook Church and its members, as an interested member of the community. Plaintiffs may argue that the School District did not create any forum at graduation because the School District controls the speakers, music, and flow of the commencement exercise. That argument ignores the larger context of the occasion: that anyone from the community may attend and wish the graduates well. Graduates from one high school frequently attend the graduation of the other high school. Siblings and former students also frequently attend. Graduations are a community event.

In effect, Plaintiffs now ask the School District to "examine" viewpoints "to determine whether they are based on some ultimate idea," and if so, for the District "to classify them" as offensive or not offensive. *See Rosenberger*, 515 U.S. at 835. Because Elmbrook Church's viewpoints are offensive to Plaintiffs, Plaintiffs ask the School District to exclude Elmbrook Church from consideration as a venue and from the graduation celebration itself. Put

_____

[8] The standards courts apply to determine whether a state has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum. *Good News Club*, 566 U.S. at 106. If the forum is a traditional or open public forum, the State's restrictions on speech are subject to stricter scrutiny than are restrictions in a limited public forum. *Id*. However, these distinctions are not material here because viewpoint discrimination is not justifiable in either a traditional or limited public forum. *See id*. at 106-07.

another way, Plaintiffs ask the School District to "throw up its hands," declaring that "because misconceptions are possible," exclusion is the best defense. *See Hedges*, 9 F.3d at 1299.

Instead, the School District has remained neutral and educated the public about its secular reasons for selecting Elmbrook Church. The fact that a small number of individuals do not believe the School District's reasons for selecting the venue is unfortunate, but that does not alter the School District's obligation to remain neutral "between religion and religion, and between religion and nonreligion." *McCreary*, 545 U.S. at 860. Plaintiffs' perception that the School District is "partial" to religion "does not permit the government to become partial" to nonreligion. *See Hedges*, 9 F.3d at 1299.

In sum, to exclude Elmbrook Church solely on the basis of its religious viewpoints would constitute impermissible viewpoint discrimination in violation of the First Amendment Free Speech clause.

## III. THE PUBLIC INTEREST IS NOT SERVED BY REARRANGING TWO HIGH SCHOOL GRADUATIONS AT THE LAST MINUTE, PARTICULARLY WHEN GRADUATIONS WILL NOT BE HELD AT ELMBROOK CHURCH STARTING IN 2010.

If the Court decides that Plaintiffs have shown a reasonable likelihood of success on the merits, the Court must still balance two additional factors: the harm to Plaintiffs if the preliminary injunction is wrongfully denied against the harm to Defendant if the injunction is wrongfully granted, and the impact on persons not directly concerned in the dispute, i.e. the "public interest." *Roth*, 57 F.3d at 1453.

Plaintiffs have come to this Court too late and without a reasonable alternative venue to hold graduation ceremonies. Plaintiffs' counsel has known since February of this year that the School District disagreed with Plaintiffs over the constitutionality of holding the June 2009 graduation at Elmbrook Church, and that the School District would not be moving the exercises

elsewhere. (See Pl. Ex. 47.) In fact, Plaintiffs' counsel were aware of the School District's prior choice of venue as far back as 2007. (See Pl. Ex. 39.) Yet Plaintiffs waited until April 22, 2009, to file their 165-paragraph Complaint. On the same date, they filed a 30-page, exhaustively cited Memorandum of Points and Authorities in Support of their Motion for Preliminary Injunction, plus 130 exhibits. Since then, Plaintiffs have filed a Motion for Leave to Proceed Using Pseudonyms, accompanied by a 22-page Memorandum and voluminous additional exhibits, and initiated several other communications with the School District requiring research and response. Americans United for Separation of Church and State has complained to the School District since 2007 without filing suit. Other anti-religious organizations have as well, and no lawsuit was filed. Plaintiffs have been preparing to file this suit for some time; they waited until weeks before the ceremonies, which handicapped the School District's response and may have put the Court in a position of having to issue a decision on a matter of nearly first impression in a very short time frame.

Plaintiffs' counsel should have learned the lesson from *Musgrove*, 2005 WL 6269441, in which the court denied preliminary relief to plaintiffs who sought to enjoin a school district from holding graduation in a church. Plaintiffs' counsel in this matter, Alex Luchenitser and Ayesha Khan, also represented the plaintiffs in *Musgrove.* Attys. Luchenitser and Khan were present at the preliminary injunction hearing when the *Musgrove* court concluded that "the delay in bringing this proceeding…has in essence caused the emergency itself and has handcuffed the Court." Id. at *1. The court found that "the rights of the innocent students, parents and friends who want to attend a graduation ceremony that's been scheduled for months…without interruption and indeed without cancellation" overcame the other factors. Id. at * 2. While the

Case 2:09-cv-00409-CNC   Filed 05/22/09   Page 41 of 45   Document 26

delay in *Musgrove* was more pronounced than in this case, the result is the same. The delay disserves the public interest.

The harm to the Plaintiffs resulting from the denial of the motion is non-existence as to one school and minimal as to the other. Only three of the Plaintiffs (Does 1, 2 and 3) have averred that they desire to attend this year's graduation ceremony.[9] Doe 1 is a senior student in one of the high schools (which one is unknown) and Does 2 and 3 and related to Doe 1 and desire to attend Doe 1's ceremony. These are the only three Plaintiffs who have testified that they desire to attend *this year's* graduation ceremony and object to it being held at Elmbrook Church. Thus, Plaintiffs' only objection is to one of the two school's graduation ceremonies being held at Elmbrook Church. Plaintiffs should be required to identify which school Doe 1 attends. From that fact, the Court should conclude that there is no harm to Plaintiffs in allowing the remaining school's ceremony to remain at Elmbrook Church, and deny Plaintiff's Motion as to that school.

However, even as to the school Doe 1 attends, the harm to these Plaintiffs is minimal as compared to the harm to the District if the injunction were granted. Doe 1 is not required to attend graduation. Neither is Doe 1's family. Doe 1's family can watch the graduation ceremonies on a professional video played over the public television and available for a minimal charge. The video does not depict the religious emblems to which these three Plaintiffs object. Moreover, any harm in these three Plaintiffs having to see religious symbols is really no different that driving by a church or holding and using U.S. currency. This minimal harm must be

---

[9]    Two of the Plaintiffs (Does 4 and 9) allege that they desire not to attend graduation ceremonies at Elmbrook Church at some time in the future (Doe 4 is not in high school). These Plaintiffs must be dismissed for lack of standing, as the District will be holding future graduation ceremonies in the District's field house, which will be available for graduation ceremonies beginning in 2010.

balanced against the harm to the District that will result if injunctive relief is ordered. The District will need to act at the last minute, try to find another location, and possibly even cancel graduation if no suitable location can be found. This is not fair to the 350 other graduates and their families in each school who have worked hard to complete their high school education. The balance of harms weighs strongly in favor of the District.

The impact of the Court's decision on persons not directly concerned in the dispute is better served by denying the Motion. The School District has not reserved any other backup facility for the two graduations. Few facilities in the Brookfield area are equipped to accommodate the estimated 2800-3000 graduates, guests, school personnel and administrators, and other community members who typically attend commencement exercises. No facilities are likely available at this late date for two graduation proceedings, much less with the advantages and reasonable rates offered by Elmbrook Church. The two high school gymnasiums are unavailable; both are under construction, one has been partially demolished, and both are scheduled for further demolition next week. While Plaintiffs have alleged upon information and belief that the School District has scheduled the Waukesha County Exposition Center as a "backup" facility, that allegation is not true. Even if it were true, such facility is simply not large enough to hold the graduation ceremonies this year assuming it were available. The public interest simply is not served by requiring the District to locate a new facility when there is simply no evidence in this record that a suitable and reasonable alternative is available. As the movants, Plaintiffs have the burden of proof to obtain the extraordinary remedy of a temporary injunction. They have failed in their proof. In light of the balance of harm and the impact on the community if the Motion were granted, Plaintiffs' request for a preliminary injunction should be denied.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request that the Court deny Plaintiffs'

Motion for Preliminary Injunction.

Dated this 22th day of May, 2009.

/s/ Lori M. Lubinsky
Lori M. Lubinsky, Bar #1027575
Sara K. Beachy, Bar # 1068648
Attorneys for Defendant
(Suite 200, 2 East Mifflin Street)
P.O. Box 1767
Madison, WI 53701-1767 (53703)
Telephone: (608) 257-5661
Facsimile: (608) 257-5444
E-mail: llubinsky@axley.com

F:\EAFDATA\759\63729\00549160.DOC

**Certificate of Service**

*Does 1-9, et al. v. Elmbrook Joint Common Sch. Dist. No. 21*
*Case No. 09-C-0409*

I hereby certify that on May 22, 2009, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Defendant's Brief in Opposition to Plaintiffs' Motion For Preliminary Injunction;
Affidavit of Brett Bowers in Opposition to Plaintiff's Motion For Preliminary Injunction;
Affidavit of Matt Gibson in Opposition to Plaintiff's Motion For Preliminary Injunction;
Affidavit of Don Labonte in Opposition to Plaintiff's Motion For Preliminary Injunction; and
Affidavit of Lori M. Lubinsky in Opposition to Plaintiff's Motion For Preliminary Injunction

I also hereby certify that I have mailed by United States Postal Service a copy of DVD attached as Exhibit B to the Affidavit of Matt Gibson to all counsel of record.

Attorney Alexander J. Luchenitser
Attorney Ayesha Khan
Attorney Elizabeth Stevens
Attorney F. Thomas Olson
Attorney James H. Hall, Jr.

s/ Kathy Butts
AXLEY BRYNELSON, LLP
Post Office Box 1767
Madison, WI 53701-1767
Telephone: (608) 257-5661
Fax: (608) 257-5444
E-mail: llubinsky@axley.com