UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DOES 1, 7, 8, and 9, Individually;
DOES 2, 4, 5, and 6, Individually,
and as taxpayers; DOES 3, a minor,
by DOES 3's next best friend, DOE 2,

        Plaintiffs,

      v.                       Case No. 09-C-0409

ELMBROOK JOINT COMMON SCHOOL
DISTRICT NO. 21,

        Defendant.

DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (DOC. # 44), DENYING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (DOC. # 52), AND DISMISSING CASE

        The plaintiffs filed this action against defendant Elmbrook Joint Common

School District No. 21 (hereinafter "the Elmbrook School District" or "the District"), on April

22, 2009, contending that the District's practice of holding graduation ceremonies and

preparatory activities for two public schools at the Elmbrook Church violates the First and

Fourteenth Amendments to the United States Constitution.  Accompanying the complaint

was a motion for preliminary injunction barring the graduation ceremonies set for June 6

and June 7, 2009, from being held at the Elmbrook Church (hereinafter "Church") or in any

other house of worship.

        After hearing from the parties and a full review of the materials submitted, this

court denied the plaintiffs' motion for preliminary injunction on June 2, 2009.[1]  Afterward,

the plaintiff filed an amended complaint seeking a permanent injunction barring the District

from conducting future commencement ceremonies or any other school event, in the

---

[1] On June 2, 2009, the court issued an oral decision denying the plaintiffs' motion for preliminary injunction.  A summary written order followed that same day.  On September 15, 2009, this court issued a Memorandum Decision further explaining the reasoning underlying the court's June 2, 2010, order.

Elmbrook Church or other religious venue. Alternatively, the plaintiffs seek a permanent injunction barring the District from holding school events at the Elmbrook Church unless all visible religious symbols are covered or removed. Additionally, the plaintiffs request monetary damages, attorneys fees, and a declaratory judgment that the practice of holding high school graduation ceremonies in a house of worship violates their rights under the U.S. Constitution. Cross motions for summary judgment on all claims are now before the court.

## I. SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 470 (7th Cir.2007). On cross motions, the court construes "all facts and inferences therefrom 'in favor of the party against whom the motion under consideration is made.'" *In re United Air Lines Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## II. BACKGROUND[2]

Of primary concern to the plaintiffs are graduation exercises for two public high schools in the Elmbrook School District, Brookfield, Wisconsin, that have been held at the Elmbrook Church, a Christian facility, also in Brookfield, Wisconsin. Brookfield Central High School ("Brookfield Central") has held its annual commencement exercises

---

[2] The parties have submitted set of stipulated proposed findings of fact, which this court has incorporated into the background section, as well as separate proposed findings of fact.

at the Church since 2000, and Brookfield East High School ("Brookfield East") has done so since 2002.

The instant action was prompted by graduation ceremonies that were set for June 6 and June 7, 2009. The District contends that starting in 2010, graduation ceremonies are to be held in newly constructed, District-owned facilities. Relatedly, the plaintiffs complain of Brookfield Central's past use of the Elmbrook Church for its annual Senior Honors Night.

The plaintiffs include students and parents of students at Brookfield East and Brookfield Central who have attended the schools' graduation ceremonies and associated activities, or who plan to attend such events in future years. Doe 1 is a 2009 graduate of Brookfield East, and participated in the Brookfield East graduation ceremony at the Church. In addition, Doe 1 attended the graduation ceremony of an older sibling, which was held at the Church within the past four years. Moreover, Doe 1 subscribes to a religious faith other than Christianity and is offended by having to attend graduation ceremonies in a Christian church.

Doe 2 is a parent of Doe 1, and sues on Doe 2's behalf and as next best friend of Doe 2's younger (minor) child, Doe 3. Doe 2 and Doe 3 were family guests at Doe 1's 2009 graduation ceremony at the Church, as well as the graduation ceremony of Doe 1's older sibling. Both subscribe to the same religious faith as Doe 1. Also, Doe 2 pays property taxes to the District and objects to the use of public funds for District-sponsored events at the Church.

Does 4, 5, and 6 are District taxpayers who object to the use of their tax moneys to support the District-sponsored events at the Church. Doe 4 has children in the District school system, the oldest of whom is set to graduate in 2016. Doe 4 is a humanist

and does not subscribe to the religious beliefs of Elmbrook Church. Does 5 and 6 are the parents of Does 7 and 8 and attended the graduation ceremonies of Does 7 and 8, which were held at the Church in 2005 and 2002, respectively. Doe 9 is a parent of minor children who attend District schools, the oldest of whom is set to graduate in 2015. Doe 9 does not subscribe to the religious teachings of the Elmbrook Church.

The District is a municipal entity that may levy taxes, issue bonds, build, acquire, lease, and sell real property including structures, bring law suits and defend law suits. The Elmbrook Board of Education has delegated to the District's superintendent "the administration of the school system in all its aspects," "the authority to make rules, regulations, and practice statements to govern routine matters of District operation," and "control and supervision of all school buildings, grounds, and equipment." The Board has empowered the superintendent to delegate any of his responsibilities and duties to his subordinates, including school principals. School principals are "responsible for the planning, operation and evaluation of the instructional and extra-curricular programs" in their schools. This includes the authority to select the venue for graduation ceremonies.

Brookfield Central and Brookfield East are two of the three high schools in the District. The third school, Fairview South School, is a specialty school and its activities are not at issue in this case. The 2009 graduating class at Brookfield East included approximately 340 students. Brookfield Central's 2009 graduating class included approximately 360 students. The number of graduates at each school has fluctuated from nearly 290 to 360 students over the past several years.

The Church is approximately 4.5 miles from Brookfield Central and 9.5 miles from Brookfield East. It is air-conditioned, accessible to persons with disabilities, has abundant free parking, and well maintained landscaped grounds. Entrances to the Church

- 4 -

are marked by signs emblazoned with crosses, and a large cross is a structural element of the Church's roof.

The District's graduation ceremonies at issue take place in the Church's vast auditorium/sanctuary. There, speakers, including students and certain District officials, deliver orations from a podium on the wide dais that spans the front of the room, and the students proceed across the dias to receive their diplomas. Persons with official roles in the graduation ceremonies sit on the dias. Graduation exercises are organized and conducted by District personnel and students. No Church officials or employees have speaking roles. The ceremonies last approximately one to two hours.

A large wooden cross, approximately fifteen to twenty feet tall and seven to ten feet wide, is affixed to the wall behind the dias and towers over the proceedings. It is in the line of sight of persons viewing activities on the dias. Two large video screens flank the cross and show close-ups of the speakers and graduates receiving their diplomas. Bibles and hymnal books remain in the pews where graduating students and their guests sit. These pews, which seat about 3,000 persons, are padded and have backs.

During past graduations, religious banners, symbols, and posters have been on display in the Church lobby. Graduates and guests walk through the lobby on their way to the auditorium/sanctuary and often congregate there after the ceremonies. Banners in the lobby have included religious phrases such as "Leading Children to a Transforming Life in Christ," and "Jesus." Other religious items, such as crosses etched into windows and Bible quotes inscribed in wood have been present in the lobby and corridors of the Church. Religious literature is also displayed at information booths in the Church. While some of the religious effects inside the Church can be removed or covered during graduation ceremonies (in fact, the large cross was veiled for the first ceremony), the Church has been

unwilling to remove or cover permanent structures (as opposed to removable items) for the District or other entities renting its facilities.

As for Brookfield Central's annual Senior Honors Night, the school started holding this event in the Church's chapel in 2003. Senior Honors Night is an occasion recognizing certain students for outstanding performances. Approximately 500 to 600 people attend Senior Honors Night, including students and their family members. Attendance is considered voluntary by the school and many eligible seniors do not attend. The chapel is a smaller, more intimate space than the auditorium/sanctuary, and has a seating capacity of approximately 1,380. A cross stands in the chapel. Notably, Brookfield East held its annual senior honors event at the Sharon Lynne Wilson Center for the Arts in 2008 and 2009. The Wilson Center is a secular facility that seats approximately 620 people. None of the plaintiffs have attended Senior Honors Night at the Elmbrook Church. For 2010 and beyond, Brookfield Central intends that this event will be held in its newly renovated facilities.

The District provides payment to the Church for use of its facilities, as do other entities. Rental cost has consistently been between $2000 and $2200 for each school's graduation, and Brookfield Central has paid between $400 and $700 to rent the chapel for Senior Honors Night. While the senior class at Brookfield East has raised funds in the past to help cover a portion of these charges, the District pays rental fees for both schools with funds obtained from local property tax revenue, which accounts for approximately 84% of the District's annual revenue. There has never been a written agreement or lease between the Church and the District for use of the Church's facilities. At various times, District staff have had difficulty scheduling the Church for the graduation exercises due to high demand for the Church's facilities.

Brookfield East began using the Church for graduation ceremonies, including rehearsals, in 2002, and Brookfield Central started in 2000. Earlier, both schools held graduation ceremonies in their respective gymnasiums. However, the gymnasiums lacked air-conditioning, and seating was limited to folding chairs on the floor and bleacher seating against the walls.

In September 1999, Brookfield Central's senior class officers wrote to the District superintendent requesting that the 2000 ceremony be moved to the Church. Brookfield Central's principal adopted this proposal. A proposal was made in 2001, to move Brookfield East's graduation ceremony to the Church and a majority of Brookfield East's graduating seniors voted to adopt the proposal. The principal approved the request and made the final decision to move graduation to the Church.

Until 2005, both schools organized advisory votes by senior classes concerning where graduation should be held. In addition, school officials held meetings for interested parents and students. Suggested graduation related sites have included the schools' gyms and football fields, the Sharon Lynne Wilson Center for the Arts, Carroll University's Shattuck Auditorium, the Milwaukee Area Technical College's Cooley Auditorium, the Pabst Theater in Milwaukee, the Waukesha County Expo Center, the U.S. Cellular Arena in Milwaukee, the Midwest Airlines Center in Milwaukee, Miller Park, the Marcus Center for the Performing Arts in Milwaukee, Wisconsin State Fair Park, Wisconsin Lutheran College, and the Church. All but the latter two are entirely secular. Usually, the students were permitted to select among two or three options, and the Church always received a clear majority of the student vote, and the principals of both schools followed the voting results. This continued after 2005, when, in lieu of advisory votes, school officials simply consulted with senior class officers each fall to ask for their preferred

graduation venue. The Church was always favored, and the principals followed the preferences of the senior class officers.

In addition, in November and December 2001, the Freedom From Religion

The principals' decisions were not upset by the District superintendent or the school board. Notably, District Superintendent Matt Gibson and Elmbrook School Board President Tom Gehl are members of the Church.

Over the years, the District has received complaints from parents, civil-liberties organizations, and community members challenging the propriety of holding public school graduation ceremonies in the Church. In October 2001, a senior's parent asked that the senior's graduation not be held in Elmbrook Church, explaining that the "Church actively promotes the idea that people like me . . . are going to . . . a Hell-like place undergoing endless torments." The parent did not want to expose the senior to "this intensely hateful and violent position."

In August 2002, an individual wrote to Superintendent Gibson stating "If I were a student in the district, I could not attend my graduation if it was held in a Church. I have corresponded with other students who feel similar to me." In 2006, another parent requested that the District's commencements be moved out of the Church because "non-Christian graduates feel uncomfortable participating in ceremonies conducted in such an environment."

In addition, in November and December 2001, the Freedom From Religion Foundation asserted constitutional objections to the District's practice. In December 2001, the American Civil Liberties Union of Wisconsin asserted constitutional objections to the practice. In May 2002, the Anti-Defamation League urged the District to move its 2002 graduation exercises to a secular venue, writing that "[i]t is patently unfair to compel

non-believers . . . to attend graduation in a highly sectarian environment," and that the practice "violate[s] the Establishment Clause."

On June 7, 2007, Americans United for Separation of Church and State ("Americans United")—now, counsel for the plaintiffs—wrote to the District, citing constitutional objections to the practice of holding graduation ceremonies at the Church, and asking that the exercises be moved to secular venues. Superintendent Gibson responded the same day, explaining that the District would not move the 2007 graduations out of the Church. He added: "Regarding your question of future years, each graduating class reviews available venues and makes its majority decision. The long term plan for the District is to construct gymnasiums that have the capacity and amenities to return our graduation exercises to their local campuses. The District held a referendum to include these spaces on April 3, 2007, and it was defeated by a 60-40 vote of the electorate."

New construction commenced at Brookfield East and Brookfield Central. This included remodeling of the existing gymnasiums and creation of a new 3,500 seat field house at Brookfield East. The new field house is air-conditioned and has ample parking. It is also accessible to persons with disabilities. Both schools anticipate that the new field houses will be the venues for all future graduations of the schools. And, the District intends that Brookfield Central's renovated gymnasium will be the venue for future Senior Honors Nights.

A subsequent referendum passed in April 2008, and on February 11, 2009, Americans United again wrote to the District, requesting that the 2009 graduation ceremonies be moved to a secular venue. Superintendent Gibson responded on February 26, 2009, explaining that the District would not move the graduation exercises from the Church. He advised: "[T]he District does not consider the usage of the Elmbrook Church

Auditorium to be a permanent venue. In fact, as a result of passage of a $62.2 million referendum in April 2008, both Brookfield East and Brookfield Central High Schools are undergoing significant renovations, which includes the construction of new, larger air-conditioned gymnasiums that will likely be able to accommodate future graduations upon completion."

## II. DISCUSSION

### A. STANDING

At the outset, the court must consider whether the plaintiffs have standing to bring suit. "The United States Constitution requires that federal courts resolve only cases and controversies." *Gonzales v. North Twp. of Lake County, Ind.*, 4 F.3d 1412, 1415 (7th Cir. 1993) (citing U.S. Const. art. III). "Only a plaintiff with a personal stake in that case or controversy has standing." *Id.* "The general rule is that to have standing to sue in federal court a 'plaintiff must allege (1) that he has suffered an injury in fact (2) that is fairly traceable to the action of the defendant and (3) that will likely be redressed with a favorable decision.'" *Books v. Elkhart County, Ind.* (*Books II*), 401 F.3d 857, 861 (7th Cir. 2005) (quoting *Books v. City of Elkhart* (*Books I*), 235 F.3d 292, 299-301 (7th Cir. 2000)). "An 'injury in fact' is an 'invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Books I*, 235 F.3d at 299).

"The party that is invoking federal jurisdiction . . . bears the burden of establishing Article III standing." *Freedom From Religion Found., Inc. v. Nicholson*, 536 F.3d 730, 737 (7th Cir. 2008). "At the summary judgment stage, the plaintiff must produce evidence in the form of . . . affidavits or documents that support the injury allegation." *Gonzales*, 4 F.3d at 1415-16.

Upon review of the materials submitted, the court is satisfied that it has jurisdiction in this case and will proceed to the merits of the claims at bar. Does 1, 2, 3, 5, 6, 7, and 8 submit that they were "forced" to attend graduation ceremonies at the Church. In doing so, these plaintiffs maintain that they were exposed to unwelcome religious symbols, which caused them mental anguish and distress. These claims are sufficient to establish standing to challenge the District's practice, and the District does not contend otherwise. *See Books II*, 401 F.3d at 861-62 (concluding that plaintiff had standing to sue based on allegation that he was forced to have unwelcome exposure to Ten Commandments display at county administration building); *Doe v. County of Montgomery, Ill.*, 41 F.3d 1156, 1159 (7th Cir. 1994) ("[The plaintiffs] allegations of direct and unwelcome exposure to a religious message cannot be distinguished from the 'injuries' of other plaintiffs who have had standing to bring claims under the Establishment Clause."); *see also Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 224 n.9 (1963) (holding that school children and their parents had standing to challenge laws requiring Bible reading in public schools, even though a student could be absent from the classroom or not participate in the reading); *see generally Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 684 (7th Cir. 1994) (noting that "parents have standing to raise their claim alleging a violation of the Establishment Clause because the impermissible establishment of religion might inhibit their right to direct the religious training of their children").

In addition, Does 2, 4, 5, and 6 assert that they pay local property taxes to the District and challenge the expenditure of such tax moneys by the District to the Church as unconstitutional. This too is sufficient for standing purposes. As the Seventh Circuit has noted, "[m]unicipal taxpayers have standing to challenge tax dollar expenditures that allegedly contribute to Establishment Clause violations." *Gonzales*, 4 F.3d at 1416

(discussing municipal taxpayer standing to sue municipality regarding crucifix display in public park (citing *Flast v. Cohen*, 392 U.S. 83, 88 (1968)); *Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir. 1988) (noting that allegation that plaintiff is a municipal taxpayer and allegation that municipality used taxpayer funds for unconstitutional activity are "two threshold criteria for establishing municipal taxpayer standing"); *see generally Hinrichs v. Speaker of House of Representatives of Ind. Gen. Assembly*, 506 F.3d 584, 600 (7th Cir. 2007) (noting that municipal taxpayer challenges to municipal actions are not subject to the same stringent standing requirements as state and federal taxpayers seeking to challenge state and federal actions).[3]

## B. ESTABLISHMENT CLAUSE CHALLENGE

"The first Clause in the First Amendment to the Federal Constitution provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' The Fourteenth Amendment imposes those substantive limitations on the legislative power of the States and their political subdivisions." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000). "[T]he purpose of the Establishment and Free Exercise Clauses . . . is 'to prevent, as far as possible, the intrusion of either the church or

---

[3] While agreeing this court has jurisdiction over the plaintiffs' claims, *see County of Montgomery,* 41 F.3d at 1161 ("The case-or-controversy requirement of Article III is satisfied if one plaintiff has standing to bring the suit." (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981)), the District asks that the claims of Doe 9 be dismissed. The District contends primarily that Doe 9 alleges no "injury in fact" and asserts claims that are not ripe. Doe 9 does not seek damages based on past injury. Instead, Doe 9 pursues relief based the fact that Doe 9's children are students in the District who are scheduled to graduate in 2015, and the District may return graduation ceremonies to the Church at some future point. If Doe 9 were the only plaintiff, concerns regarding ripeness may be appropriate. Injury to Doe 9 is contingent on the anticipated achievements of Doe 9's children, and a return of District ceremonies to the Church, which has become less likely given the newly constructed District facilities. *See Texas v. United States,* 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81(1985)). However, as pointed out by the plaintiffs, at the time this litigation was initiated, the District had been holding graduation ceremonies at the Church for nearly a decade based on alleged concerns of comfort and cost, which remain constant. In any event, further discussion on this point is unnecessary inasmuch as the plaintiffs have established standing to proceed on the merits.

the state into the precincts of the other." *Lynch v. Donnelly*, 465 U.S. 668, 672 (1984) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971)). "At the same time, however, the [Supreme] Court has recognized that 'total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable.'" *Id.* Thus, courts are routinely faced with attempting to reconcile "the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that . . . total separation of the two is not possible." *Id.*

For the most part, it is understood that the religion Clauses bar state and federal governments from, among other things, "aid[ing] one religion, aid[ing] all religions, or prefer[ing] one religion over another[;] . . . forc[ing] []or influenc[ing] a person to go to or to remain away from church against his will[;] and. . . lev[ying tax] to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15-16 (1947). With this in mind, the Supreme Court established three "tests" in *Lemon v. Kurtzman*, 403 U.S. at 612-13, "for determining whether a government practice violates the Establishment Clause." *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 592 (1989). Ordinarily, these tests guide a court's consideration of such claims. *See McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 859 (2005) (reaffirming *Lemon*'s "three familiar considerations for evaluating Establishment Clause claims"). Under the *Lemon* test, a government policy or practice violates the Establishment Clause if (1) it has no secular purpose, (2) its primary effect advances or inhibits religion, or (3) it fosters an excessive entanglement with religion. *See Vision Church v. Village of Long Grove*, 468 F.3d 975, 991 (7th Cir. 2006); *Books II*, 401 F.3d at 862 ("Government action violates the First Amendment if it fails any one of these three inquiries." (citing *Edwards v. Aguillard*, 482

U.S. 578, 583 (1987))). However, the Supreme Court has noted that "the factors identified in *Lemon* serve as 'no more than helpful signposts.'" *Van Orden v. Perry*, 545 U.S. 677, 685 (2005) (quoting *Hunt v. McNair*, 413 U.S. 734, 731 (1973)). Moreover, the Court has sidestepped *Lemon* in several Establishment Clause cases. *See e.g. Van Orden*, 545 U.S. at 686 (finding the *Lemon* test "not useful" for consideration of Ten Commandments monument on State Capitol grounds, and relying instead on "the nature of the monument and . . . our Nation's history"); *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) (relying on past precedent in considering challenge to government aid provided to private schools); *Lee v. Weisman*, 505 U.S. 577 (1992) (relying on "controlling precedents" in school prayer and religious exercise cases and finding Establishment Clause violation); *Marsh v. Chambers*, 463 U.S. 783 (1983) (relying on historical acceptance of salaried legislative chaplains and of prayer opening legislative sessions). In any event, the court's charge is "delicate and fact intensive . . . and is of necessity one of line drawing, of determining at what point a dissenter's rights of religious freedom are infringed by the State." *Lee*, 505 U.S. at 597-98; *see also Cohen v. City of Des Plaines*, 8 F.3d 484, 489 (7th Cir. 1993).

The plaintiffs' challenge rests on four interrelated grounds. First, they argue that holding graduation ceremonies at the Church violates the Establishment Clauses's bar against governmental religious coercion, as discussed in *Lee v. Weisman*. Second, they contend that holding graduation ceremonies at the Church constitutes governmental endorsement of religion. Third, they submit that the District's arrangement with the Church leads to excessive entanglement between government and religion. And finally, they maintain that the District is using taxpayer funds impermissibly to promote religion. (*See* Pls.' Br. in Supp. Mot. for Summ. J. 8.) These assertions are addressed in turn.

1. COERCION

As an initial matter, the plaintiffs' contend that the District is engaging in government-sponsored religious coercion by essentially forcing students and their guests to attend a Christian house of worship and, therein, exposing the students and their guests to Christian iconography. The essence of the plaintiffs' argument is the District's actions are akin to school-sponsored prayer, respecting which, under certain circumstances, the Supreme Court has found unconstitutional.

To this end, the plaintiffs point to *Lee v. Weisman*, 505 U.S. 577, in which the Supreme Court held that a prayer delivered by clergy at a public school graduation ceremony violated the Establishment Clause. The Court cited to two "dominant facts" that indicate improper "state-sponsored and state-directed religious exercise in a public school": (1) "State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies," and (2) "[e]ven for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory." 505 U.S. at 586-87. As to the former, the Court observed that not only did the state's role include deciding to insert a prayer into the ceremony and choosing the clergy member (in that case, a rabbi), but also providing the rabbi guidance on crafting a prayer appropriate for the "civic occasion." *Id.* at 588. It was unimportant that the school made a good faith attempt to remove sectarianism; the Court's concern centered on the goal of "produc[ing] a prayer to be used in a formal religious exercise which students, for all practical purposes, are obliged to attend." *Id.* at 589. Additionally, the Court mentioned "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Id.* at 592. It observed that a dissenter is nonetheless pressured by the school to stand silently during

the prayer, an act that for many constitutes participation (as opposed to respectful protest) in that exercise: "The injury caused by the government's action, and the reason why Daniel and Deborah Weisman object to it, is that the State, in a school setting, in effect required participation in a religious exercise." *Id.* at 594. The school setting was distinguished from other forums, such as a statehouse, because the "influence and force of a formal exercise in a school graduation" was deemed clearly different from an atmosphere in which adults are free to enter and leave without comment. *Id.* at 596-97.

In *Santa Fe Independent School District v. Doe,* 530 U.S. 290, the Court reaffirmed the principles set forth in *Lee*. At issue in that case was the constitutionality of prayers drafted and approved by students who voted whether invocations should be given, and if so, which students should deliver them over the public address system prior to school football games. The School District argued that *Lee* was inapplicable inasmuch as the prayer was a student driven initiative without active involvement by school officials, and that extracurricular activities like football games lack the coercive environment of a graduation ceremony. The Court rejected these arguments, finding that the prayer was attributable to the District despite being student led, and that the nature of the football games, including compelled attendance by many students (athletes, cheerleaders, band members), was insufficiently distinguishable from the situation in *Lee*. 530 U.S. at 311. In the court's view "the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship." *Id.* at 312.

As pointed out by the District, the cases relied on by the plaintiffs speak to coerced religious participation as opposed to exposure to religious symbols. *See, e.g.*, *Lee*, 505 U.S. at 598 ("[T]he state has in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every

- 16 -

student, one the objecting student had no real alternative to avoid."); *Santa Fe Indep. Sch. Dist.*, 530 U.S. 290; *Schempp*, 374 U.S. 203(holding unconstitutional the daily reading of Bible verses in public schools); *Berger v. Rensselaer Cent. Sch. Corp.*, 982 F.2d 1160, 1170-71 (7th Cir. 1993) (comparing *Lee v. Weisman* and finding improper coercion where public school elementary students were compelled to sit through religious presentation and receive Bibles individually from a religious organization); *see also Tanford v. Brand*, 104 F.3d 982, 985 (7th Cir. 1997) (distinguishing *Lee v. Weisman* because, while the case involved a benediction at a university graduation, the circumstances revealed that "there was no coercion—-real or otherwise—to participate").  However, the plaintiffs insist that their situation is sufficiently similar because it involves "exposure to unwanted expressions of religion."  According to the plaintiffs, "[b]y holding the graduations and honors ceremonies at Elmbrook Church, the District not only forces graduates and their families to enter and participate in a ceremony within a Christian house of worship, but also compels their exposure to unwanted sectarian symbols." (Pls.' Br. in Supp. Mot. for Summ. J.  5.)  The plaintiffs bolster their comparison through reference to various cases, articles, and scholarly works discussing generally the spiritual meaning that Christian houses of worship and symbols have to some observers.

In looking to the "dominant facts" of *Lee*, however, the court cannot conclude that obligatory participation in a secular graduation ceremony, albeit in a church, is sufficiently similar to obligatory participation, even through silence, in religious prayer.  In other words, a ceremony in a church is not necessarily a church ceremony.  Indeed, there is simply no religious exercise at issue in this case, let alone one attributable to the District, that students are arguably compelled to participate in despite objection.

No controlling authority cited by the plaintiffs encourages such a significant expansion of the "coercion" analysis. Indeed, the Supreme Court has cautioned against reading *Lee* too broadly:

> The First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow.

505 U.S. at 598 (quoting *Schempp,* 374 U.S. at 307(Goldberg, J., concurring))). In this case, the allegations of unconstitutional coercion are undermined by the lack of District involvement in a religious exercise likely to influence religious identity or induce participation. *See Myers v. Loudoun County Pub. Schs.*, 418 F.3d 395, 406-07 (4th Cir. 2005) ("The indirect coercion analysis discussed in *Lee*, *Schempp*, and *Engel*, simply is not relevant in cases, like this one, challenging non-religious activities."). The plaintiffs unease and offense at having to attend graduation ceremonies at the Church and face religious symbols, while in no way minor, is not enough. *See Lee*, 505 U.S. at 597. ("People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation."). *But see Lemke v. Black*, 376 F. Supp. 87 (E.D. Wis. 1974 ) (Reynolds, C.J.) (enjoining school from holding graduation ceremony at a church given that, among other things, some graduates could not attend without violating their consciences[4]).

---

[4] Chief Judge Reynold's brief opinion in *Lemke* is not particularly helpful to the plaintiffs because, while speaking to similar issues, it lacks discussion of the applicable constitutional framework as most recently set forth by the Supreme Court.

## 2. ENDORSEMENT

The plaintiffs next contend that holding graduation ceremonies at a church constitutes state endorsement of religion in violation of the Establishment Clause. And it is well observed that the Constitution "'mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *See McCreary County*, 545 U.S. at 860 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). "'When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides.'" *Vision Church*, 468 F.3d at 991 (quoting *McCreary County*, 545 U.S. at 860).

The starting point for this analysis remains the criteria established by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, and the cases that have built on and interpreted that case. As discussed earlier, under the *Lemon* test, a government policy or practice violates the Establishment Clause if (1) it has no secular purpose, (2) its primary effect advances or inhibits religion, or (3) it fosters an excessive entanglement with religion. "The Supreme Court has refined the analysis under the first two prongs of *Lemon*, focusing on 'whether the challenged governmental practice either has the purpose or effect of endorsing religion, a concern that has long had a place in [the Supreme Court's] Establishment Clause jurisprudence.'" *Cohen*, 8 F.3d at 489 (citing *Allegheny County*, 492 U.S. at 592)).

For present purposes, the plaintiffs do not contend that holding graduation ceremonies and Senior Honors Night at the Church lacked a secular purpose. Instead, the plaintiffs submit that holding District events, such as graduation ceremonies, at the Church has the primary *effect* of endorsing religion. "The effect prong asks whether, irrespective

of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Books II*, 401 F.3d at 866 (quoting *Freedom from Religion Found. Inc. v. City of Marshfield, Wis.*, 203 F.3d 487 (7th Cir. 2000)). Courts evaluate the effect of the challenged government action by "assessing the totality of the circumstances" surrounding the event to determine whether an "objective, reasonable observer, aware of the history and context of the community and forum" would fairly understand the event to be a government endorsement of religion. *Books II*, 401 F.3d at 866-67 (citations omitted); *Vision Church*, 468 F.3d at 993 ("'In this prong, our focus is not on the intent of the City, but on whether a reasonable person, apprised of the circumstances surrounding the sale, would conclude that the sale amounted to an endorsement of religion." (quoting *Mercier v. Fraternal Order of Eagles*, 395 F.3d 693, 705 (7th Cir. 2005))).

Endorsement, according to the plaintiffs, is an inherent consequence of holding public school ceremonies in a church replete with religious symbols and messages, regardless of the purported secular purpose. They point to the large cross, banners, and other items that are present in the Church auditorium/sanctuary during graduation ceremonies, which are presided over by District officials. The same applies to Senior Honors Night held in the Church chapel. The plaintiffs add that the schools have held graduation ceremonies at the Church for several consecutive years, and that the District's superintendent and the president of the school board are members of Elmbrook Church. Moreover, the plaintiffs note that numerous secular venues are available—a point illustrated by Brookfield East's use of the Wilson Center for its senior honors event. The plaintiffs also assert that when student votes were held regarding the graduation venue, District officials "allowed students to choose between only two or three venues, one of which was always the Church," as opposed to presenting "all of the ten or so potential

venues." (Pls.' Br. in Supp. Mot. for Summ. J. 22.)  According to the plaintiffs, this scenario would lead a hypothetical reasonable person to view the District's selection and use of the Church for graduation ceremonies and Brookfield Central's Senior Honors Night as an endorsement of religion.

The court, however, cannot reach the same conclusion under the circumstances.  While it is unquestioned that the plaintiffs are offended by utilization of the Church as a venue for District events, "the endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from the discomfort of viewing symbols of faith to which they do not subscribe."  *See Books II*, 401 F.3d at 867 (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779 (1995) (O'Connor, J., concurring)).  Here, the "history and context of the community and the forum" reflect that secular concerns directed the move away from school facilities toward an adequate, convenient, cost-effective graduation venue—an objective that, according to the District, is fulfilled by the Church more completely than the alternative venues suggested.

The record indicates that the shortcomings of the District's then-current facilities, along with the Church's modern amenities, close location, and reasonable cost, were motivating factors for moving graduation to that location initially and remained so through 2009.  The secular purpose underlying the move is reaffirmed by the lack of any long-term arrangement between the District and the Church respecting use of the site.  *See Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 527-28 (7th Cir. 2009) (noting that "the government lacks a secular purpose under *Lemon* only when 'there is no question that the statute or activity was motivated wholly by religious considerations'" (quoting *Books II*, 401 F.3d at 863)).

- 21 -

Prior to 2010, the schools' facilities lacked air conditioning, provided inadequate space, and were not handicap friendly. In contrast, the Church is located within a few miles of the schools, is handicap accessible, includes ample, free parking, has large video screens for close-up viewing, permits the District to record and replay the ceremonies on public access television, and requires payment of user fees consistent with costs (including energy use and custodial services) that would be incurred by the schools if they attempted to use their own facilities. Further, nothing in the record suggests that any of the alternative locations suggested by the plaintiffs are equal or superior to the Church in terms of amenities, convenience, and costs. Moreover, the graduation ceremonies at issue are secular and devoid of religious activity or involvement of clergy. Also, the Church is used once a year for each schools' graduation ceremony and for Brookfield Central's Senior Honors Night—events that require large and accessible (preferably indoor) venues—and there is no agreement between the District and the Church that suggest that the Church may exercise control over either activity.

Further, that students voted on the location for their graduation activities does not reveal a constitutional violation. The plaintiffs' reliance on *Santa Fe Independent School Dist v. Doe* for such a proposition is misplaced inasmuch as the Court focused on policy behind the student election at issue in that case and the resulting "expressive activities." *See* 530 U.S. at 317 n.23 ("We have concluded that the resulting religious message under this policy would be attributable to the school, not just the student . . . . For this reason, we now hold only that the District's decision to allow the student majority to control whether students of minority views are subjected to a school-sponsored prayer violates the Establishment Clause.").

On its face, the District's decision to hold graduation ceremonies and the senior honors event in a house of worship holds symbolic force. However, considering the totality of circumstances, the reasonable observer would fairly understand that the District's use of the Church for these events is based on real and practical concerns, and not an impermissible endorsement of religion. *Cf. Clarke*, 588 F.3d at 529 (finding impermissible endorsement "where an authority figure invited a Christian organization that engaged in religious proselytizing to speak on numerous occasions at mandatory government employee meetings"). This conclusion is reinforced by the District's stated intent to hold future graduation ceremonies and other events in newly constructed District-owned facilities.

### 3. EXCESSIVE ENTANGLEMENT

Moving on, the plaintiffs assert that by holding graduation ceremonies and Senior Honors Night at the Church, the District has entangled itself excessively with religion in violation of the Establishment Clause. "The general rule is that, to constitute excessive entanglement, the government action must involve 'intrusive government participation in, supervision of, or inquiry into religious affairs.'" *Vision Church*, 468 F.3d at 995 (quoting *United States v. Indianapolis Baptist Temple,* 224 F.3d 627, 631 (7th Cir. 2000); *see also Agostini v. Felton*, 521 U.S. 203, 232-33 (1996) (concluding that "excessive entanglement" is to be treated as an aspect of the inquiry into "effect"). Courts have recognized that excessive entanglement may occur through "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Vision Church*, 468 F.3d at 995 (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 393 (1990)).

Here, the plaintiffs contend that the District is impermissibly delegating to the Church "the authority to control the physical setting of public-school events," and in turn,

the District is impermissibly interfering with the Church's operations.  As to the former, the plaintiffs submit that the physical setting for graduation activities permits the Church "to expose thousands of graduation attendees per year—including numerous youths—to its religious message."  (Pls.' Br. in Supp. Mot. for Summ. J. 23.)  As to the latter, the plaintiffs hypothesize that "[i]f the District attempts to cleanse the Church of religious symbols and items in order to hold District events there, the District would have to decide which objects in the Church are religious and which are not—exactly the kinds of judgments government officials must not make."  (*Id.* at 23-24.)  Relatedly, the plaintiffs argue the arrangement increases the risk of community divisiveness along religious lines.

However, as to each position, the plaintiffs rely primarily on a patchwork of dicta from several First Amendment cases that have touched on "excessive entanglement" but otherwise have little relation to the situation here.  *See e.g., Lemon*, 403 U.S. 602 (state statute providing aid to teachers in nonpublic schools); *Agostini*, 521 U.S. 203 (New York City program sending public teachers into private schools); *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982) (state statute vesting governing bodies of churches with power to veto applications for liquor licenses); *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680 (1987) (rejecting petitioner's argument that a tax code provision governing charitable contributions to religious organizations results in excessive entanglement in that the IRS is required to ascertain information from religious institutions regarding services and commodities).  Such cases concern much more enduring arrangements linking the state to religious entities and religious activities.

The district court decision in *Spacco v Bridgewater School Department*, 722 F. Supp. 834 (D. Mass. 1989), which the plaintiffs rely on, is also distinguishable.  In that case, the school district conducted elementary school classes in a Parish Center owned

by the Roman Catholic Church. Of particular concern to the court was the underlying lease agreement, which provided that "the Church could terminate the lease if, in its view, anything being continuously taught to children attending school at the Parish Center conflicted with Roman Catholic doctrine." 722 F. Supp. at 845. According to the court, this provision "gives the Church the power to influence the elementary school curriculum." *Id.* Here, there is no agreement (written or otherwise) through which the District could be said to have impermissibly delegated its authority to the Church, and no legal authority pointed to by the plaintiffs indicates that periodic rental of a religious venue for secular public school related functions qualifies as excessive entanglement. As discussed earlier, District high school graduation activities at the Church are controlled by the District, and the record suggests that non-permanent religious items may be removed. Thus, it appears the entities have made some effort to avoid entanglement, and given the limited nature of the District's event specific rental arrangements with the Church, *excessive* entanglement of the type proscribed by the Establishment Clause is lacking. *See Agostini*, 521 U.S. at 233 ("Entanglement must be "excessive" before it runs afoul of the Establishment Clause.")

As to the plaintiffs' concerns respecting political divisiveness, it is understandable that cases such as this touch on strongly held beliefs within the community. The plaintiffs indicate that over the years several groups and individuals have expressed their views to the District regarding graduation exercises at the Church. However, as the plaintiffs concede, the possibility that a program may increase the dangers of political divisiveness is insufficient to indicate "excessive entanglement," *see Agostini*, 521 U.S. at 206, and without more, the plaintiffs are unable to demonstrate that divisiveness in the District is of such extent that it adds materially to their claim. *See also Lynch,* 465 U.S. at 684 (noting that the Supreme Court "has never held that political

divisiveness alone was sufficient to invalidate government conduct"). *But see Lemke,* 376 F. Supp. 87 (indicating that increased religious politicization was a factor in enjoining school from holding graduation ceremony at a church).

### 4.  USE OF TAXPAYER FUNDS

Plaintiffs next contend that the use of local property taxes to pay fees charged by the Church for rental of its facilities violates the Establishment Clause. Specifically, they assert that tax receipts that are paid to the Church by the District advance the Church's ability to promulgate its religious message to graduation attendees, and that the absence of restrictions on the use of those funds leaves the Church free to spend the money for religious purposes.

At the outset, it is significant that the challenged arrangement is far from the government funded, statutorily authorized school aid programs or tax exemptions addressed in cases such as *Mitchell v. Helms*, 530 U.S. 793 (2000) (federal funds channeled through state program to private schools), *Lemon v. Kurtzman*, 403 U.S. 602 (state aid, in the form of salary supplements, to certain private school teachers), *Walz v. Tax Commission of the City of New York*, 397 U.S. 664, 668 (1970) (property tax exemption for religious entities), and *Freedom from Religion Foundation, Inc. v. Bugher*, 249 F.3d 606, 613 (7th Cir. 2001) (state program providing "cash grants to private, sectarian schools" with "no real restrictions on the use of the grant money by the religious schools."). In contrast, the record reflects that the taxpayer funds paid to the Church for use of its facilities during graduation is akin to a common fee-for-use arrangement that mirrors rental arrangements between the Church and other entities. Moreover, the secular purpose of the arrangement undercuts the plaintiffs' contention that the funds have the effect of aiding religion. *See Agostini*, 521 U.S. 203  (discussing criteria for determining

whether government aid has the effect of advancing religion); *Porta v. Klagholz*, 19 F. Supp. 2d 290, 303 (D.N.J. 1998) (addressing the entanglement prong of *Lemon*, and finding a public school's lease of Church space "no different from the normal interface between landlord and tenant in leased space; money is paid for services received subject to conditions of use articulated in the lease and course of conduct.").  And given that the Supreme Court has repudiated "the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends," *Hunt,* 413 U.S. at 743, the plaintiffs cannot succeed in establishing a constitutional violation.  Now, therefore,

IT IS ORDERED that the defendant's motion for summary judgment on all claims (Doc. # 44) is granted.

IT IS FURTHER ORDERED that the plaintiffs' motion for summary judgment (Doc. # 52) is denied.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 19th day of July, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE